PROPERTY GROUP, INC. *v.* PLANNING AND ZONING
COMMISSION OF THE TOWN OF TOLLAND
(14630)

PETERS, C. J., CALLAHAN, BORDEN, BERDON, NORCOTT,
KATZ and PALMER, Js.[1]

[1] This case was orally argued on May 6, 1993, before a court of five justices consisting of Borden, Berdon, Norcott, Katz and Palmer, Js. The court subsequently determined that the case should be considered en banc. Pursuant to Practice Book § 4112, Chief Justice Peters and Justice Callahan were added to the court and considered the case upon full review of the record, briefs and transcripts of the oral argument.

Argued May 6—decision released July 27, 1993

*Richard S. Conti,* for the appellant (defendant).

*Edward S. Hyman,* for the appellee (plaintiff).

*Mark K. Branse* filed a brief for the Connecticut Federation of Planning and Zoning Agencies et al. as amici curiae.

KATZ, J. The certified issue in this appeal is whether a town may enact regulations authorizing a planning and zoning commission to condition its approval of a subdivision application on the applicant's widening of a public highway abutting the proposed subdivision.[2]

[2] We granted certification limited to the following issue: "Under the facts of this case, did the Appellate Court properly conclude that the planning and zoning commission did not have the authority to condition its approval

Although this issue had been among those argued in the Appellate Court, that court did not decide the issue because it affirmed the trial court's judgment on the ground that the record lacked substantial evidence to satisfy the requirements of the regulations relied upon by the defendant. *Property Group, Inc.* v. *Planning & Zoning Commission,* 29 Conn. App. 18, 27–28, 613 A.2d 1364 (1992). We granted the petition for certification to appeal filed by the defendant planning and zoning commission of the town of Tolland (commission) in order to decide whether the commission had the authority to condition approval of a subdivision application on an off-site improvement. *Property Group, Inc.* v. *Planning & Zoning Commission,* 224 Conn. 912, 617 A.2d 167 (1992). Because we concur with the Appellate Court's assessment of the record, however, we leave the resolution of the certified issue for another day.

The Appellate Court opinion set forth the following pertinent facts. "The plaintiff [Property Group, Inc.,] applied to the commission for approval to subdivide a parcel of land into ten residential building lots. Each proposed lot fronts on Buff Cap Road, a town road. The commission approved the application, with a condition requiring the plaintiff to widen Buff Cap Road to a paved width of sixteen feet from its center line for the entire length of the frontage, approximately 2000 feet [and extending beyond the property's frontage a distance of 100 feet at the north and south termini of the property].[3] The condition obligates the plaintiff to be

of the plaintiff's subdivision application on the plaintiff's widening of a public highway abutting the proposed subdivision?" *Property Group, Inc.* v. *Planning & Zoning Commission,* 224 Conn. 912, 617 A.2d 167 (1992).

[3] "Buff Cap Road is a road approximately 2.9 miles in length. The entire length of the road has a paved width of approximately twenty feet. That portion of Buff Cap Road·abutting the proposed subdivision will be the only stretch of the road with a paved width greater than twenty feet. The paved width of the road abutting the subdivision would then be twenty-six feet." *Property Group, Inc.* v. *Planning & Zoning Commission,* 29 Conn. App. 18, 19 n.1, 613 A.2d 1364 (1992).

responsible for the actual improvement work involved in laying the pavement and providing for drainage for a width of six feet for the entire length of the frontage.

"The plaintiff appealed the road widening condition to the Superior Court, which sustained the plaintiff's appeal, finding that 'under the present state of the law off-site considerations may not, therefore, constitute the basis for denying a subdivision application or as in this case, requiring off-site improvements where the use is permitted under the existing zoning law.' " *Property Group, Inc.* v. *Planning & Zoning Commission,* supra, 29 Conn. App. 19.

On appeal to the Appellate Court, the commission claimed that because the plaintiff has a fee interest in the six foot area to be paved (property), the trial court should not have found that the road widening condition would result in an off-site improvement. Id., 19–20. The commission also maintained that even if the condition resulted in an off-site improvement, the trial court was incorrect to strike it. Id. The commission argued that by virtue of § 166-6 (D)[4] of the Tolland subdivision regulations and General Statutes (Rev. to 1991) § 8-25,[5] the enabling legislation, it had the authority

[4] Section 166-6 (D) of the Tolland subdivision regulations provides: "In cases where reasonable and necessary need for an off-site improvement or improvements is necessitated or required by the proposed development application and where no other property owners receive a special benefit thereby, the Commission may require the applicant, as a condition of subdivision approval and at the applicant's sole expense, to provide for and construct such improvements as if such were on-site improvements, including development of public roads contiguous to the subdivision."

[5] General Statutes (Rev. to 1991) § 8-25 provides: "SUBDIVISION OF LAND. (a) No subdivision of land shall be made until a plan for such subdivision has been approved by the commission. Any person, firm or corporation making any subdivision of land without the approval of the commission shall be fined not more than five hundred dollars for each lot sold or offered for sale or so subdivided. Any plan for subdivision shall, upon approval, or when taken as approved by reason of the failure of the commission to act, be filed or recorded by the applicant in the office of the town clerk within ninety

to condition its approval of the plaintiff's subdivision application on the plaintiff's widening of the public road. Id., 20.

days of the date such plan is delivered to the applicant, but, if it is a plan for subdivision wholly or partially within a district, it shall be filed in the offices of both the district clerk and the town clerk, and any plan not so filed or recorded within the prescribed time shall become null and void, except that the commission may extend the time for such filing for two additional periods of ninety days and the plan shall remain valid until the expiration of such extended time. All such plans shall be delivered to the applicant for filing or recording promptly after the time for taking an appeal from the action of the commission has elapsed, and in the event of an appeal, promptly upon the termination of such appeal by dismissal, withdrawal or judgment in favor of the applicant. No such plan shall be recorded or filed by the town clerk or district clerk or other officer authorized to record or file plans until its approval has been endorsed thereon by the chairman or secretary of the commission, and the filing or recording of a subdivision plan without such approval shall be void. Before exercising the powers granted in this section, the commission shall adopt regulations covering the subdivision of land. No such regulations shall become effective until after a public hearing, notice of the time, place and purpose of which shall be given by publication in a newspaper of general circulation in the municipality at least twice, at intervals of not less than two days, the first not more than fifteen days nor less than ten days, and the last not less than two days prior to the date of such hearing. Such regulations shall provide that the land to be subdivided shall be of such character that it can be used for building purposes without danger to health or the public safety, that proper provision shall be made for water, drainage and sewerage and, in areas contiguous to brooks, rivers or other bodies of water subject to flooding, including tidal flooding, that proper provision shall be made for protective flood control measures and that the proposed streets are in harmony with existing or proposed principal thoroughfares shown in the plan of development as described in section 8-23, especially in regard to safe intersections with such thoroughfares, and so arranged and of such width, as to provide an adequate and convenient system for present and prospective traffic needs. Such regulations shall also provide that the commission may require the provision of open spaces, parks and playgrounds when, and in places, deemed proper by the planning commission, which open spaces, parks and playgrounds shall be shown on the subdivision plan. Such regulations may, with the approval of the commission, authorize the applicant to pay a fee to the municipality or pay a fee to the municipality and transfer land to the municipality in lieu of any requirement to provide open spaces. Such payment or combination of payment and the fair market value of land transferred shall be equal to not more than ten per cent of the fair market value of the land to be subdivided prior to the approval of the sub-

In deciding whether it was necessary for the trial court to address the commission's authority to require off-site improvements, the Appellate Court first exam-

division. The fair market value shall be determined by an appraiser jointly selected by the commission and the applicant. A fraction of such payment the numerator of which is one and the denominator of which is the number of approved parcels in the subdivision shall be made at the time of the sale of each approved parcel of land in the subdivision and placed in a fund in accordance with the provisions of section 8-25b. The open space requirements of this section shall not apply if the transfer of all land in a subdivision of less than five parcels is to a parent, child, brother, sister, grandparent, grandchild, aunt, uncle or first cousin for no consideration, or if the subdivision is to contain affordable housing, as defined in section 8-39a, equal to twenty per cent or more of the total housing to be constructed in such subdivision. Such regulations, on and after July 1, 1985, shall provide that proper provision be made for soil erosion and sediment control pursuant to section 22a-329. Such regulations shall not impose conditions and requirements on manufactured homes having as their narrowest dimension twenty-two feet or more and built in accordance with federal manufactured home construction and safety standards or on lots containing such manufactured homes which are substantially different from conditions and requirements imposed on single-family dwellings and lots containing single-family dwellings. Such regulations shall not impose conditions and requirements on developments to be occupied by manufactured homes having as their narrowest dimension twenty-two feet or more and built in accordance with federal manufactured home construction and safety standards which are substantially different from conditions and requirements imposed on multifamily dwellings, lots containing multifamily dwellings, cluster developments or planned unit developments. The commission may also prescribe the extent to which and the manner in which streets shall be graded and improved and public utilities and services provided and, in lieu of the completion of such work and installations previous to the final approval of a plan, the commission may accept a bond in an amount and with surety and conditions satisfactory to it securing to the municipality the actual construction, maintenance and installation of such improvements and utilities within a period specified in the bond. Such regulations may provide, in lieu of the completion of the work and installations above referred to, previous to the final approval of a plan, for an assessment or other method whereby the municipality is put in an assured position to do such work and make such installations at the expense of the owners of the property within the subdivision. Such regulations may provide that in lieu of either the completion of the work or the furnishing of a bond as provided in this section, the commission may authorize the filing of a plan with a conditional approval endorsed thereon. Such approval shall be conditioned on (1) the actual construction, maintenance and installation of any improvements or utilities

ined whether the property was off-site or on-site. Id., 20–21. In reaching its determination that the property was off-site, the Appellate Court relied principally on the language of § 8-25, which provides in part that "[n]o *subdivision of land* shall be made until a plan for such subdivision has been approved by the commission. . . . Such regulations shall provide that the *land to be subdivided* shall be of such character . . . ." (Emphasis added.) The Appellate Court also noted that the maps submitted with the plaintiff's application failed to show that the property that the plaintiff was required to improve as a condition for approval of its subdivision was part of the land to be subdivided. Id., 21. Finally, the Appellate Court concluded that the

prescribed by the commission or (2) the provision of a bond as provided in this section. Upon the occurrence of either of such events, the commission shall cause a final approval to be endorsed thereon in the manner provided by this section. Any such conditional approval shall lapse five years from the date it is granted, provided the applicant may apply for and the commission may, in its discretion, grant a renewal of such conditional approval for an additional period of five years at the end of any five-year period, except that the commission may, by regulation, provide for a shorter period of conditional approval or renewal of such approval. Any person, firm or corporation who, prior to such final approval, sells or offers for sale any lot subdivided pursuant to a conditional approval shall be fined not more than five hundred dollars for each lot sold or offered for sale.

"(b) The regulations adopted under subsection (a) of this section shall also encourage energy-efficient patterns of development and land use, the use of solar and other renewable forms of energy, and energy conservation. The regulations shall require any person submitting a plan for a subdivision to the commission under subsection (a) of this section to demonstrate to the commission that he has considered, in developing the plan, using passive solar energy techniques which would not significantly increase the cost of the housing to the buyer, after tax credits, subsidies and exemptions. As used in this subsection and section 8-2, passive solar energy techniques mean site design techniques which maximize solar heat gain, minimize heat loss and provide thermal storage within a building during the heating season and minimize heat gain and provide for natural ventilation during the cooling season. The site design techniques shall include, but not be limited to: (1) House orientation; (2) street and lot layout; (3) vegetation; (4) natural and man-made topographical features; and (5) protection of solar access within the development."

property, the "present and future use [of which] is determined by its prior dedication as a public road, not by the subdivision plan"; id.; "abuts the land to be subdivided . . . is part of the right-of-way of an existing public road" and, therefore, had been properly termed off-site by the trial court. Id. Consequently, the Appellate Court concluded that the trial court was required to address § 166-6 (D) of the Tolland subdivision regulations as the basis on which the commission relied for regulatory authority to impose the challenged condition on its approval of the proposed subdivision plan.

Before concluding that it was unnecessary to decide the issue of the commission's authority to order off-site improvements, however, the Appellate Court reviewed General Statutes § 8-25 as the purported statutory authority for the enactment of § 166-6 (D) of the Tolland subdivision regulations. It stated: "There is nothing in § 8-25 that authorizes a planning commission to require a developer to improve an existing abutting public highway where no intersecting subdivision streets are being created. Section 8-25 sets forth with specificity the power of a planning commission to promulgate regulations for exactions from a developer for open spaces, parks, and playgrounds or to exact from the developer a fee in lieu of open spaces. In addition, the statute empowers the planning commission to promulgate regulations for proposed streets, especially their safe intersections with existing or proposed principal thoroughfares, and the manner in which they are to be graded and improved and public utilities and services provided." *Property Group, Inc.* v. *Planning & Zoning Commission,* supra, 29 Conn. App. 23.[6] Sec-

---

[6] It is this passage from the Appellate Court's opinion that generated the certified issue in this appeal. As we explain later, however, we do not reach that issue because we agree with the Appellate Court's alternative conclusion that there was not substantial evidence in the record to support the application of the local regulation that was enacted pursuant to General Statutes § 8-25.

tion 166-6 (D) requires that, if an off-site condition is to be imposed as a condition of subdivision approval, there must be a finding that there is a "reasonable and necessary need for an off-site improvement or improvements . . . necessitated or required by the proposed development application . . . ." The Appellate Court determined that the record lacked "substantial evidence" to satisfy the requirements of this regulation and concluded that in the absence of such evidence, it was unnecessary to decide whether the regulation was a valid promulgation of the commission's authority. Id., 28. We agree.

I

In addressing whether § 166-6 (D) of the Tolland subdivision regulations is applicable to this case, and whether its requirements were satisfied, we must first decide whether the commission's condition pertains to an "off-site improvement" within the meaning of § 166-6 (D). We agree with the Appellate Court that the trial court correctly determined that the property required to be improved is off-site.

The condition requires the plaintiff to improve property that was not part of "the land to be subdivided." General Statutes (Rev. to 1991) § 8-25. In interpreting land use ordinances, "the question is the intention of the legislative body as found from the words employed . . . ." *Lawrence* v. *Zoning Board of Appeals,* 158 Conn. 509, 511, 264 A.2d 552 (1969). These words "are to be interpreted in their natural and usual meaning." Id.; see *Harlow* v. *Planning & Zoning Commission,* 194 Conn. 187, 193, 479 A.2d 808 (1984). "[L]and to be subdivided" does not include abutting public streets, and "proposed streets" does not embrace an existing public street. We have recently stated that the use of the word, "proposed" in General Statutes §§ 8-3 (g) and 8-7d (b), "indicates that the legislature

meant to distinguish planned structures, alterations or uses from structures, alterations or uses that have already been fully or significantly implemented." *Gelinas* v. *West Hartford*, 225 Conn. 575, 584, 626 A.2d 259 (1993). The same interpretation should control that adjective when used in a local land use regulation like § 166-6 (D). See *Link* v. *Shelton*, 186 Conn. 623, 627, 443 A.2d 902 (1982) (courts "may look to the meaning given the same phrase in unrelated statutes . . . and consider that where the legislature uses the same phrase it intends the same meaning").

The property in question had long ago been dedicated as part of the right-of-way of an existing public road. It is undisputed that the six foot strip on Buff Cap Road is part of an existing street that does not intersect with either existing or proposed principal thoroughfares. It is, therefore, off-site.

The commission contends that the issue of whether the property is on-site or off-site turns on whether the plaintiff owns the fee interest in the road bed.[7] This

---

[7] Because the plaintiff acknowledged its duty to convey the six foot strip to the town, it was reasonable for the trial court to conclude that it had accepted its ownership of the property. We have "long accepted [the] view that a developer can be required to contribute land for a road network *within* the subdivision." (Emphasis added.) T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 232. In such instance, however, the exacted property must "satisfy a need 'uniquely and solely attributable' to the subdivision" under consideration Id.; see *Raybestos-Manhattan, Inc.* v. *Planning & Zoning Commission*, 186 Conn. 466, 442 A.2d 65 (1982); *Weatherly* v. *Town Plan & Zoning Commission*, 23 Conn. App. 115, 579 A.2d 94 (1990). The Appellate Court in *Weatherly* expressly avoided, however, any implication that it intended to give approval to the type of off-site improvements described in § 166-6 (D) of the Tolland subdivision regulations. "As applied by the commission, § 2.1.10 [of the Fairfield subdivision regulations] is reasonable and impartial in that it neither obligates an applicant to pay for the required road widening nor requires any off-site improvements. The applicant may satisfy this section of the regulations by dedicating a por-

argument fails for several reasons. First, this position requires a planning commission acting on a subdivision application to make the legal determination of fee title to abutting public roads. Such a tribunal, usually consisting of laypersons, where rules of evidence are not applicable and informality necessarily prevails, is ill-equipped to hear and decide definitively such a matter. *Forest Construction Co.* v. *Planning & Zoning Commission,* 155 Conn. 669, 676, 236 A.2d 917 (1967); *McMahon* v. *Board of Zoning Appeals,* 140 Conn. 433, 435, 101 A.2d 284 (1953).

Second, the commission's reliance on the plaintiff's ownership of a fee interest ignores the impact that the town's right-of-way imposes on the plaintiff's free exercise of the use of its land. "[T]he taking of the highway creates two easements: the public easement of travel, that permits the general traveling public to pass over the highway at will, and the private easement of access, that permits landowners who abut the highway to have access to the highway and to the connecting system of public roads." *Luf* v. *Southbury,* 188 Conn. 336, 341, 449 A.2d 1001 (1982). In light of the multiplicity of issues that surround an ownership interest in a public road, such as restrictions on use and alienation by the fee owner, as well as the consequences of abandonment, "[p]ublic regulation of land use and development pursuant to the exercise of the police power often

tion of his property to the town so it may widen the road . . . ." *Weatherly* v. *Town Plan & Zoning Commission,* supra, 123.

The commissioner's reliance on *Raybestos-Manhattan, Inc.* v. *Planning & Zoning Commission,* supra, is equally misplaced. We held therein that the developer could be required to extend an existing public road through the land being subdivided. The proposed road extension, however, was on-site as part of the land being subdivided and was truly a proposed road as described in General Statutes § 8-25. The plaintiff acknowledges the requirement of dedication sanctioned in *Weatherly,* and the commission recognizes that this was the plaintiff's expectation.

results in some diminution of the property rights of a particular landowner." Id., 349.

Indeed, recognition of the limitations on the plaintiff's free enjoyment of its property probably reflects why this six foot strip that the commission required the plaintiff to improve as part of the land to be subdivided was not shown on the map submitted with the application. Accordingly, we conclude that the Appellate Court correctly determined that this property is off-site.

II

The commission contends that § 166-6 (D) of the Tolland subdivision regulations authorizes it to condition subdivision approval on off-site improvements. Section 166-6 (D) provides: "In cases where reasonable and necessary need for an off-site improvement or improvements is necessitated or required by the proposed development application and where no other property owners receive a special benefit thereby, the Commission may require the applicant, as a condition of subdivision approval and at the applicant's sole expense, to provide for and construct such improvements as if such were on-site improvements, including development of public roads contiguous to the subdivision." Therefore, assuming its validity,[8] arguendo, the regu-

---

[8] Although we do not decide today the certified issue, we recognize that it is a significant one for those persons who have an interest and a stake in land use control. The area of public regulation of roads is spotted with inconsistencies and lack of resolution. A municipality is not required to construct a road to serve a property owner; see *Ventres* v. *Farmington,* 192 Conn. 663, 473 A.2d 1216 (1984); although it must maintain the roads it has accepted. General Statutes § 13a-99. A municipality may deny a subdivision application because there is no public road to provide access to the proposed subdivision; it may, therefore, prevent development where the subject property has not been served by a public road. *Nicoli* v. *Planning & Zoning Commission,* 171 Conn. 89, 368 A.2d 24 (1976). Even if the applicant buys the land required for the road and builds it, and thereafter dedicates it to the public, the town need not accept the road. General Statutes

lation has three distinct requirements that must be satisfied before an off-site improvement can be the condition upon which a subdivision application is granted.

In the context of review of subdivision applications, "[p]roceedings before planning and zoning commissions

§ 13a-48; see E. Sostman & J. Anderson, "The Highway and the Right of Way: An Analysis of the Decisional Law in Connecticut Concerning Public, Private and Proposed Roads From Establishment to Abandonment," 61 Conn. B.J. 299 (1987). A municipality can, through use, finally and impliedly accept the dedication. See *Meshberg* v. *Bridgeport City Trust Co.,* 180 Conn. 274, 429 A.2d 865 (1980). Similarly, it can abandon a road it has accepted by formal act or nonuse. General Statutes § 13a-49. Once a road has been accepted and the statutory obligation to maintain becomes operative, however, competing interests and matters of public policy surface. Can an applicant seeking to develop remote land serviced by a seldom traveled road be forced to upgrade the quality of the road as a condition of the granting of the application, or should the municipality be forced to absorb the expensive improvement and ultimately pass the cost on to those parties buying into the new development through taxes? Cases before this court have raised, but not directly answered, this issue. *Reed* v. *Planning & Zoning Commission,* 208 Conn. 431, 544 A.2d 1213 (1988); *Luf* v. *Southbury,* 188 Conn. 336, 449 A.2d 1001 (1982). In *Luf* v. *Southbury,* supra, 351, this court implicitly recognized that a town can reject a subdivision application when no road of access exists, although a different rule may apply when the town has abandoned a public road that provided insufficient access to support new development.

In *Reed* v. *Planning & Zoning Commission,* supra, this court affirmed the Appellate Court's judgment upholding the trial court's judgment sustaining the appeal of the plaintiff whose subdivision application had been rejected because of the commission's determination that the road access was unsafe. In concluding that the commission's regulations did not authorize its rejection of the application on the ground that the road access was unsafe, this court raised and left unanswered the fundamental question of whether the town's regulations could allow it to reject an application because of inadequate roads, or conversely, whether the town's regulations could allow it to condition granting an application on the applicant's improvement of the subject public access road? Id., 437. Professor Tondro has remarked upon the "unsatisfactory" status of the law; T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 249; and our "unwillingness to provide any guidance on this question." Id., p. 248. We are not insensitive to the need for developers, municipalities and taxpayers to have direction; however, we are not in the practice of providing advisory opinions. *Harkins* v. *Driscoll,* 165 Conn. 407, 409, 334 A.2d 901 (1973). Because the regulation in issue was not satisfied, we do not reach the question of its validity.

are classified as administrative." *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission,* 212 Conn. 727, 733, 563 A.2d 1347 (1989). "Conclusions reached by the commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency. The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached. *Calandro* v. *Zoning Commission,* 176 Conn. 439, 440, 408 A.2d 229 (1979). The action of the commission should be sustained if even one of the stated reasons is sufficient to support it." *Primerica* v. *Planning & Zoning Commission,* 211 Conn. 85, 96, 558 A.2d 646 (1989); see also *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 539–40, 525 A.2d 940 (1987). "The evidence, however, to support any such reason must be substantial . . . ." *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 540. "This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . [It] is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . [It] imposes an important limitation on the power of the

courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [I]t is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) Id., 541.

We agree with the Appellate Court's conclusion that the record does not contain substantial evidence demonstrating that a "reasonable and necessary need for an off-site improvement or improvements is necessitated or required by the proposed development application." Tolland Subdivision Regs. § 166-6 (D). Nor is there evidence in the record demonstrating that the widening of the road is necessary for public health or safety reasons, or that the improvements are necessary to provide better drainage for either the road or adjoining property. Likewise, the record lacks support for the proposition that any adverse condition will arise because of the plaintiff's subdivision that requires the road widening and improvements. We conclude that the commission did not have before it "substantial evidence" to meet the requirements of § 166-6 (D) of the Tolland subdivision regulations and to support its administrative decision.

The record demonstrates that neither the commission nor the plaintiff regarded safety as a vital factor to be considered in deciding whether the commission should require the plaintiff to widen Buff Cap Road. The determination, rather, seemingly depended on the commission's view of the expense to maintain the trees growing within the town's right-of-way for the road. To the plaintiff, the large trees were attractive and an asset to the tract and the prospect of their wholesale

removal at the plaintiff's expense was extremely unwelcome. To the commission, avoiding the cost to the town for maintaining those trees was the priority, and therefore, their health was a crucial factor in imposing the condition that it did.

At the public hearing on September 10, 1990, no testimony was offered suggesting that the need for widening Buff Cap Road was attributable to the addition of ten building lots on a road that already accommodated seventy-three homes. To the contrary, the testimony revealed that there were no plans to widen the remaining portions of the road. Mark Cadman, chairman of the commission, stated: "The Town does not have any other plans beyond this at this point." Ronald Blake, the town planner, responded: "Not that I know of. It would be strictly for the road in front of this property." The record reveals that the focus of the discussion regarding whether to impose this condition to widen the road was on the consequential removal of trees. At the hearing, Cadman stated: "So the Town's major interest in this is to protect it from incurring costs later, if they had to widen the road and take down the trees." Blake replied: "The Town's interest would be to have the road widened . . . by the subdivider. You know, the whole job which would include taking down the trees. . . . [I]t's our suggestion that the road be widened from the centerline inward sixteen feet. I think that that would probably require the removal of most of those trees." It is abundantly clear from the record that the town's major interest in having the road widened was to protect itself from incurring the cost of removing the trees that had already become a hazard. It was noted that "two or three dozen very large and very substantial trees" would have to be removed in order to satisfy the condition of improving the road.

Public comments were received regarding the potential hazard if the trees were allowed to remain.[9] Specifically, one witness spoke of the cost and danger associated with an incident that had occurred two years earlier when one of the larger trees had fallen down and caused damage to telephone and electric lines. Two other witnesses commented that some of the larger trees are "very close to the road," and that driving with care is required so as not to hit a tree. Another witness remarked that "a wide road makes sense" if consideration were to be given to children riding bicycles around the bend in the road.

No testimony was offered, however, that this subdivision would add to or exacerbate the concerns of the commission and the public. Instead, there was significant comment and opinion expressed that the other seventy-three property owners on Buff Cap Road would have to absorb the cost of tree removal that would eventually be required if the town did not condition the approval of the subdivision on the widening of the road and consequent tree removal. One neighbor remarked that a new resident could hit one of the trees and "raise a ruckus and all of us that live here have to pay a little higher taxes to do that at the town's expense." Another neighbor who lived between two lots of the proposed subdivision agreed: "[S]upporting [the prior witness'] conversation there. The tree that fell down and took out the wires, the telephone or electric company kept trim, even though the tree was dead . . . they just kept trimming it but because of the substantial cost of removing it, they left it in place until the tree finally came down. So they just kept taking the branches off and . . . if you take a trip up the street you'll see a lot of the trees have branches leaning over the wires

---

[9] Some of the neighbors did not want the trees removed because they were "attractive" and added to the town's character. These neighbors believed that removal of those trees would "tend to destroy" the ambiance.

across the street. I live there all the time between lots 9 and 10 and I think the trees look beautiful but I think they're also a hazard. I think you've got to weigh one against the other. So I wouldn't like to see all the trees taken down but I'd like to see them maintained. But, the Town would be stuck with that."[10]

At the conclusion of the public hearing on September 10, 1990, the commission voted to table the matter in order to allow for an on-site inspection before taking action on the application. The purpose of that on-site inspection is clear from the minutes of the subsequent meeting of September 24, 1990. The minutes provided in part: "Ron Parker reported the results of his inspection of this parcel and the trees in question. He feels that the trees are not worthy of preservation as the bulk of them are located on a very narrow strip along the road and cited their proximity to the pavement. He cited over-maturity of some of the trees, injuries incurred from road salting, [and] density producing asymmetrical canopy causing forking. He felt that these trees would be a detriment to the town." The record is clear that the sole purpose of the inspection was to examine the condition of the trees.

On the basis of this record, there was not substantial evidence presented to the commission to satisfy the requirements of § 166-6 (D) of the Tolland subdivision regulations. Once the commission had determined that the trees were not in good condition and that they would require maintenance or removal by the town in the future, the commission acted to avoid the expense of such work by requiring the plaintiff to remove the trees as a condition of subdivision approval. Rather

---

[10] The evidence that the tree removal and street widening would provide a distinct "special benefit" to the other seventy-three Buff Cap Road property owners was uncontroverted and, therefore, sufficient, in and of itself, to defeat the commission's reliance on § 166-6 (D) of the Tolland subdivision regulations.

than requiring the town to respond to any problems caused by the trees to the seventy-three property owners already living on Buff Cap Road, the commission placed the burden to alleviate those problems on the plaintiff. Indeed, rather than causing the problem, the plaintiff was viewed as providing a solution to an existing concern.

Additionally, there was no evidence that a projected increase in traffic volume required that the road be widened. Traffic in the area is presently generated by the existing seventy-three homes and the motorists using Buff Cap Road to go to and from Interstate Route 84, Route 74, and other secondary highways. No evidence was offered to suggest that the addition of nine homes necessitated or required the road widening.[11] Moreover, were this the case, it seems that the commission would have been concerned with widening the entire length of Buff Cap Road. The commission specifically acknowledged, however, that there were no such plans.

On the issue of drainage, the record also does not support the necessity of widening the road. "The grade of the land is generally below Buff Cap Road . . . sloping to the south and to the west so that any storm water or increase in activity from building will not affect Buff Cap Road. All the drainage is away . . . from the road."

Any concern regarding the impact of the proposed subdivision on sight line could be cured by removing

---

[11] Interestingly, the only discussion of any traffic problem relates to one of the commission's creation. If the commission orders that the road be widened, this, in turn, would require removal of hazardous trees. This tree removal will then have a deleterious effect on traffic safety. As one witness commented: "Well, I guess if the road is widened, then you have to watch out that speeds don't increase also. So, I think there's another Catch-22, if you're looking at that one."

the trees without widening the road and installing drain pipes for 2000 feet. Moreover, the issue of sight line for any specific driveway is dealt with by the zoning enforcement officer of the town when, as is required, a permit is requested before construction is started on a house. Tolland Zoning Regs. §§ 170-125, 170-126 and 170-127. Section 170-127 specifically provides: "A preapplication form is required before a zoning permit is issued for new dwellings. For the purpose of this section, 'design review' means a review of the plans to determine . . . that other considerations of the Commission are adequately addressed. Among those considerations are . . . landscaping, building placement . . . *sight line* . . . ." (Emphasis added.)

In conclusion, § 166-6 (D) of the Tolland subdivision regulations authorizes the commission to condition the approval of subdivision applications only under circumstances that the present record does not manifest. There was no evidence before the commission to show that widening of Buff Cap Road was required "by the proposed development application" or that "no other property owners [would] receive a special benefit thereby." Tolland Subdivision Regs. § 166-6 (D). Indeed, there is no indication that § 166-6 (D) was considered in the commission's deliberations or that an intent to comply with that regulation helped form the collective intent of the commission. The commission members neither mentioned the regulation nor addressed its requirements. The record of the commission proceedings demonstrates that the commission never explored whether the proposed subdivision might have an adverse impact on existing public facilities.

The record discloses, rather, that the commission's imposition of the road widening condition was motivated by concerns entirely separate from the concerns of § 166-6 (D). The record describes an existing condition—trees in need of attention. By attempting

to limit the town's exposure to future expenses in connection with the removal of those already hazardous trees on Buff Cap Road, the commission lost sight of its purpose and its powers. The Appellate Court correctly determined, therefore, on the basis of its review of the record, that the record failed to support the requirements of the commission's regulations and that court properly affirmed the trial court's judgment sustaining the plaintiff's appeal.

Accordingly, the judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., concurring. I concur in the result.