[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Outlet Broadcasting, Inc./WVIT (hereinafter "Outlet") at all times herein was and is the owner of premises located at 200 Colt Highway in the Town of Farmington containing approximately 10 acres located on what is known as Rattlesnake Mountain in Farmington. Located on said property is a primary television transmission tower 1060 feet tall and a 100 feet tall tower used only as a backup to WVIT's transmissions. On or about December 2, 1998, Outlet filed a variance application with the Farmington Zoning Board of Appeals (hereinafter "ZBA") requesting a variance of the application of Article II Section 1 (B) (12) of the Farmington Zoning Regulations (hereinafter "Regulations") to demolish the existing 1060' tower and build a new television transmission tower on said property which is located in an R-80 zone. The aforementioned section of the Regulations permits the building of such a tower "provided the base of the tower is located a minimum distance from any property line at least equal to the height of the tower. Any guy CT Page 11667 wires used to support the tower shall be at least 100 feet from any property line." The present tower of 1060' in height does not meet either of these zoning requirements. However, the 1060 foot tower, which is the focus of this appeal, was built before the above zoning Regulations were adopted and is, therefore, a non-conforming structure. The proposed tower which would be 1020 feet in height would have on top of it what has been called a Starmount which has also been described as a candelabra in shape or even a Christmas tree in shape that would allow a transmission of television broadcasting for WVIT, Channel 30, WFSB, Channel 3 and WEDH, Channel 24. This addition of the Starmount would raise the height to approximately 1100'. Under present zoning regulations the base of the tower would have to be at least 1100 feet from any property line. The proposed tower would in fact be located approximately 236.54 feet from the nearest property line. The proposed tower's guy wires would be approximately 19 feet from the nearest property line whereas the Regulations require it to be at least 100 feet from any property line. On or about December 30, 1998, Outlet applied to the ZBA for a variance of the aforementioned guy wire 100 feet from any property line requirement. The ZBA held a public hearing on the December 2, 1998 application on December 21, 1998 and a combined hearing on January 19, 1999 for both the December 2, 1998 and December 30, 1998 variance applications.
On the same evening, January 19, 1999 the ZBA's vote to grant Outlet the tower location variance was a tie of 3-3, thereby denying the application. The guy wire application was denied by a vote of four to two. By letter of January 22, 1999 Outlet was notified of the findings of the ZBA which were, inter alia, as follows:
 "a) The applicant failed to demonstrate adequate hardship. Members found that the zoning regulations permitted a number of other uses to be made of the property under the R-80 zone. The regulations also permitted the erection of a tower lower in height.
 b) The applicant failed to demonstrate that this proposal would conserve the public health, safety, and property values. Members found insufficient evidence that the proposed location of the tower would provide adequate protection for neighboring properties from falling ice or debris. Concerns were also raised about the stability of the proposed starmount antenna design. Finally, it was the Commission's finding that the aesthetic design of the tower and starmount would not be in keeping with the adjoining residential area and CT Page 11668 may negatively impact the property values of surrounding homes.
 At the same meeting, Outlet Broadcasting, Inc./WVIT's application for reduction in the separation of guy wires for radio/TV tower from property line from 100 feet to 19 feet for property located at 200 Colt Highway also was denied, by a vote of four to two. Members voting against the proposal cited the same reasons given in the preceding vote."
From said denials, the plaintiff, Outlet, brought these timely appeals. The appeal concerning the distance from the base of the tower to the property line, also called the "Fall Zone", is appeal No. 1, and the appeal concerning the denial of the variance of the guy wires requirement is appeal No. 2.
AGGRIEVEMENT
Aggrievement is a jurisdictional matter and a prerequisite for maintaining an appeal. Winchester Woods Associates v. Planning ZoningCommission, 219 Conn. 303, 307, 592 A.2d 953 (1991). "The question of aggrievement is essentially one of standing." (Citation omitted.)DiBonaventura v. Zoning Board of Appeals, 24 Conn. App. 369, 373,573 A.2d 1222 (1991). Unless the plaintiff alleges and proves aggrievement, the Court must dismiss the appeal. Id. General Statutes § 8-8 (a) defines an "aggrieved person" as "any person owning land that abuts or is within the radius of one hundred feet of any portion of the land involved in the decision of the board."
During the Court hearing of September 19, 2000 the parties stipulated that the plaintiff, Outlet, at all times relevant hereto, was and is the owner of the property subject of the applications for a variance. Further, the Court also makes such a finding based upon a certificate of title from Outlet's attorney and the maps which are part of the Record and a map submitted as an exhibit by the plaintiff. Accordingly, the Court finds that the plaintiff, Outlet, is statutorily and classically aggrieved.
STANDARD OF REVIEW
A trial Court may grant relief in an appeal from a decision of an administrative authority only where the authority has acted unreasonably, illegally, arbitrarily or has abused its discretion. Smithv. Zoning Board of Appeals, 227 Conn. 71, 80, 629 A.2d 1089 (1993) — The Court, however, "may not substitute its judgment for the wide CT Page 11669 and liberal discretion vested in the local authority when acting within its prescribed legislative powers . . . ." (Internal quotation marks omitted.) Frito-Lay, Inc. v. Planning Zoning Commission, 206 Conn. 554,572-73, 538 A.2d 1039 (1988). The Court simply determines whether the record reasonably supports the conclusions reached by the agency.DeBeradinis v. Zoning Commission, 228 Conn. 187, 198, 635 A.2d 1220
(1994)
"The burden of proof is on the plaintiff to demonstrate that the board acted improperly." Spero v. Zoning Board of Appeals, 217 Conn. 435, 440,586 A.2d 590 (1991)
The commission's action is to be sustained if any one of the reasons stated is sufficient to support its decision. See Property Group, Inc.v. Planning Zoning Commission, 226 Conn. 684, 697, 628 A.2d 1277
(1993)
CGS 8-6 (3) permits a zoning board of appeals to grant a variance as follows:
 ". . . to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured . . ." Emphasis added.
Two basic conditions must be satisfied. They are: "(1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan." Aitken v. Zoning Board of Appeals,18 Conn. App. 195, 204 (1989)
"It is for this reason that the rule is well established that the financial loss or the potential for financial advantage to the applicant is not the proper basis for a variance." Garribaldi v. Zoning Board ofAppeals, 163 Conn. 235, 239 (1972) CT Page 11670
A variance should not be granted to allow the property owner to implement modern technology to expand a use to allow a business to remain competitive. Berlani v. Zoning Board of Appeals, 160 Conn. 166 (1970). It is well settled law in Connecticut that financial hardship could only be considered if the effect of the regulation on the applicant's property would be confiscatory.
ISSUES:
 1. Did the applicant fail to demonstrate that this proposal wouldconserve the public health, safety, and property values?
The short answer to this question is "yes". The reason given by Outlet for demolishing its existing tower and replacing it with a more modern tower is that the existing tower, although adequate to support an analog antenna which it presently does, is not large enough to support a digital antenna, which Outlet argued it was required by the Federal Communications Commission ("FCC") to have in place by November 1, 1999. Obviously, that deadline has passed, and there has been no compliance. Outlet claims that if it does not have a digital antenna, WVIT will lose its broadcast license. It should also be noted that the existing tower has an antenna weighing 6000 pounds, but with the starmount or candelabra the weight thereof will be 16 tons for each of three antennas or 48 tons totaling 100,000 pounds. Not only is the height with the starmount 1,100 feet instead of the 1060 feet, but the weight is considerably more resulting in a massive structure.
The ZBA, at the hearing of January 19, 1999 heard from Tom O'Brien, president and general manager of NBC 30 WVIT, Outlet. He introduced David Bondanza, WVIT's director of engineering and operations, Charles Zablonski, NBC's vice president of network engineering and development, Matthew Valsidis, an independent engineer who is the lead engineer for the subject tower project, and John LeCourtier, the chief engineer of Kline Towers, a professional engineer, as well as Bill Smyres, chief acoustical engineer of Close, Jensen and Miller, a professional engineering firm located in Wethersfield, Connecticut. The defendant, Chase, presented at the same public hearing its expert witness, Joseph Vellozzi, a professional engineer, a PhD and a national expert on towers. Vellozzi testified that he had thirty-five years of experience in the industry not dealing just with towers but with other special structures. For example, he engineered the arm in the Statue of Liberty when it was rehabilitated in 1985, he worked on other notable structures such as the Golden Gate Bridge and stated that he probably has been involved with over a thousand tower projects over the past ten or fifteen years in which he has concentrated heavily in towers. He testified that the proposed tower would be steep guyed. He stated that the tower would CT Page 11671 probably fall somewhere between a radius of thirty percent and fifty percent meaning approximately a radius of 300 foot fall zone or a 500 foot fall zone and that would encroach on a good circumference of the Chase property to the north and the property of the Town of Farmington which also contains Will Warren's den. He further testified that a half inch of ice could form on the starmount and that it could also be two inches of ice in thickness, and if you consider the density of the ice and the density of wind that has to accelerate it to move it out, two inches of ice will tend to fall within a 300 to 400 feet radius. He stated that sheets of a half inch thick could easily go out 750 to 1000 feet. He further testified that one half inch of ice in a fifteen mile wind will go out 500 feet; that it's a real fact that light pieces of ice are going to fall onto the Chase subdivision [that has been approved]. He further testified, as to safety issues, that "What happens because the guys are so steep guyed, in order to resist the horizontal forces they have developed more tension. More tension means bigger guys sizes . . . The guy sizes on this Tower are 3 and 3/8, which is more than double the size if you look at the metallic area . . . the steepness of the guys raises concerns about the high frequency and the low frequency vibrations. First of all, with guys above three inches, it's beyond the state of the art in controlling high frequency galloping. I mean high frequency aolean vibrations. What aolean vibrations are are the high frequency singing of the guys that could lead to fatigue . . . We have no guarantee that we are going to be able to control the aolean vibrations at that kind of tension . . . There are still concerns regarding the safety issues regarding the tower." Mr. Vellozzi concluded that the stability of the tower is in serious question because of the diameter of the guywires as indicated. He also indicated that if the tower collapsed due to lack of stability, it would fall on abutting property as indicated. In short, he, in effect, declared that the proposed tower would be unsafe for neighboring property owners and set forth specific opinions and facts to support such a finding.
Outlet presented its experts who stated that the proposed tower would be safe. Mr. Vellozzi stated that it would not be safe. The Court has examined the testimony of the experts and finds that the ZBA had every right to rely on the testimony of Mr. Vellozzi and not on the testimony of Outlet's experts. For example, Mr. LeCourtier, one of plaintiff's experts, talked about the US Army reports on the current list of tower failures. ZBA member Perrault questioned LeCourtier and said "I assume that every one of these towers had a starmount structure on the top of them." LeCourtier replied "No, No, Sir". Perreault then said "So then, this, this chart basically is irrelevant to the tower we're talking about". LeCourtier answered "If you consider starmount, this is no starmount, you could say that, yes". Mr. Perrault further questioned the accuracy of Mr. LeCourtier's testimony. See pages 3 and 4 of the January CT Page 11672 19, 1999 public hearing. As has been stated above, the Court cannot substitute its judgment for that of the ZBA. There is nothing in Mr. Vellozzi's testimony that would indicate it is deficient in any way. The members of the ZBA had a right to listen to all of the experts and make their own judgment as to which experts they chose to believe. Apparently they set more stock in the testimony of Mr. Vellozzi than in the testimony of Outlet's experts. Accordingly, on this issue, the ZBA did not act unreasonably, arbitrarily, illegally or in abuse of its discretion. It should also be noted that the ZBA could take into account the size of the starmount when concluding "Finally, it was the commission's finding that the aesthetic design of the tower would not be in keeping with the adjoining residential area." Not only could the ZBA make that conclusion based upon the testimony it heard as to the increase in size and weight of the starmount but it also heard from several residents who claimed that the result of the proposal by Outlet would be harmful to the aesthetics of the area. The members of the ZBA could conclude from all of that that property values would be adversely affected. Outlet's appraiser, Warren Katz, may or may not have been believed by the members of the board.
2. Did the applicant fail to demonstrate adequate hardship?
There was no evidence other than the statements by the applicant that Outlet would lose its license if it did not comply with the digital tower requirements. The ZBA could choose to believe or disbelieve that. Further, there was evidence that the zoning regulations permitted a number of other uses to be made of the property. Without any need for a variance, the property could be used for a one family residence. As to whether or not the cost of taking down the existing tower and putting up a one family residence would be prohibitive is a matter of speculation. There was no evidence that this would be the case, and the ZBA could find within its discretion that a residential home could be built. Further, there was no evidence that the current tower could not be maintained or that a smaller tower could not be constructed. Additionally, there are other uses that would be allowed under special permit. These are listed on page 15 of the Town of Farmington Zoning Regulations, Exhibit 25 of the Record. It is true that Outlet would have to obtain another variance because it only has a fifty foot frontage, but if the ZBA or planning and zoning commission were to allow a special permit, the ZBA would probably grant that variance as well. The only hardships propounded by Outlet were financial hardships or financial hardships resulting from more modern technology being needed. However, as aforementioned, these are not valid hardships supporting a variance. The only basis on which a financial hardship could be utilized in the granting of a variance is if the regulations would amount to confiscation of the property. This is obviously not the case because of the continued use of the property as it CT Page 11673 is the ZBA not having any firm evidence that Outlet would lose its license, the use of the property for a residential home which would be. allowed even with the fifty foot frontage without seeking a variance as well as the other uses by special permit. The Court queried Outlet's attorney regarding the height of the Channel 61 tower on the Chase property and concluded that it was at least 1300 feet high, and, therefore, the fall zone of that tower could result in the potential collapse of the Channel 61 tower onto most of Outlet's property. However, that is not sufficient to say that the regulation makes the Outlet property confiscatory. The planning and zoning commission of the Town of Farmington has approved a subdivision for Chase on property adjacent to Outlet's property which subdivision is within the present fall zone of the existing Outlet tower. Apparently there is nothing to prohibit the use someone wishes to make of their property for residential purposes even though that property is within the fall zone of a television tower. Therefore, the existence of the 1300 foot Channel 61 tower, even though its fall zone would consume most of Outlet's property, does not prohibit the building of a one family residence or the continuation of the existing tower, etc., and, therefore, the existing Channel 61 tower does not make the regulation confiscatory as to Outlet's property. Accordingly, the ZBA acted properly and within its discretion in denying the variances based upon the applicant's failure to demonstrate adequate hardship in both cases.
3. Did Outlet meet its burden of showing that the proposed varianceswould not affect substantially the comprehensive zoning plan?
It is well settled law in Connecticut that a town's comprehensive plan is found in the zoning regulations themselves. Article IV Section 1(B) (b) states as follows, in pertinent part:
 "A nonconforming structure or building may be repaired or maintained, however it may not be demolished and replaced by a new nonconforming structure except as provided for in this section."
Paragraph (c) provides in pertinent part:
 "A nonconforming structure or building which is damaged or destroyed by fire, explosion or natural disaster may be rebuilt . . ."
The regulations themselves permit the rebuilding of a structure only if it is damaged or destroyed by fire, explosion, or natural disaster. Granting of the subject variances would not be in conformity with these regulations. CT Page 11674
It is part of the record which was before the ZBA that Chase, on June 5, 1998, applied for a modification of the zoning regulations to the town planning and zoning commission to reduce the fall zone from 100 percent to 50 percent of the height of a tower. This was apparently for the benefit of the tower for Channel 61. The town planning and zoning commission rejected that application (return of record 17). Thus, the town planning and zoning commission which establishes the regulations and, therefore, the comprehensive plan of the town rejected a proposal to reduce the fall zone from 100 percent to 50 percent giving a clear recognition that to grant a variance as requested by Outlet would be contrary to the regulations and the comprehensive plan. Further, the variance requested by Outlet would reduce the fall zone by 80 percent or from 100 percent to 20 percent. This is a serious violation of the comprehensive plan because it would just about emasculate the regulation, and, further, if the town planning and zoning commission was not willing to reduce the fall zone by 50 percent, it would certainly not be willing to reduce it by 80 percent.
Accordingly, this Court finds that Outlet has failed to meet its burden of showing that the variances would not affect substantially the comprehensive zoning plan. See Aitken v. Zoning Board of Appeals, supra.
It should also be noted that even if the variances were granted, Outlet would still be left with the need to obtain a variance of the 200 foot frontage requirement for said property. That application has not been filed and was not pending at the time of the ZBA's decisions herein.
CONCLUSION:
For the reasons stated above, this Court concludes that the ZBA did not act unreasonably illegally, arbitrarily, capriciously or in abuse of its discretion, and that there is substantial evidence supporting the ZBA's denials of the applications. Accordingly, the appeals are dismissed.
Rittenband, JTR