[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Par Developers, Ltd. ("plaintiff"), appeals a decision of the defendant, the Town of Killingworth Planning 
Zoning Commission ("Commission"), denying the plaintiff's application for approval of a four lot subdivision in the Town of Killingworth. The parties have filed briefs, and argument was heard by the court on May 31, 1995.
I. FACTS
CT Page 10679
The plaintiff's proposed four lot subdivision adjoins an old municipal landfill that is listed by the Department of Environmental Protection in the "Inventory of Hazardous Waste Sites in Connecticut." Record #4. In addition, this site appears on the federal Comprehensive Environmental Response Compensation and Liability Act database (CERCLIS). Record #4. A sketch of the proposed lots and the old landfill is attached to Record #4, at p. 5. Record #4.
The land involved in the aforementioned application remains from a 189.8 acre parcel that has been twice subdivided by the plaintiff. Record #40: Decision of the Commission, dated November 23, 1992 ("Decision"), at 1. On July 1, 1980, eleven (11) lots were approved and four lots (lots 1-4) were denied by the Commission. Decision, at 1. On May 19, 1981, forty-seven (47) lots were approved, and, on July 7, 1981, two lots (lots 1 and 3) were denied by the Commission. Decision, at 1. The plaintiff then appealed the Commission's decision, denying approval for lots 1 and 3, to the Superior Court in the Judicial District of Middlesex. Said appeal, however, was denied by the Court on November 8, 1983. Decision, at 1.
Thereafter, on October 16, 1991, the plaintiff filed a document, purporting to be an application, concerning the aforementioned four lots with the Inland Wetlands and Watercourses Commission ("Inland/Wetlands") in the Town of Killingworth. Record #11. Inland/Wetlands met and reviewed the plaintiff's "application." Supplemental Record #6. In light of the fact that Inland/Wetlands was unable to determine what the plaintiff was requesting, however, on October 25, 1991, it mailed back both the "application" and the check the plaintiff had submitted, along with an accompanying letter explaining the proper procedure for applying to Inland/Wetlands for subdivision review.
On November 19, 1991, the Commission received from the plaintiff an application requesting subdivision approval for the aforementioned four lots. Supplemental Record #2: Minutes of the Commission ("Commission Minutes"), dated 11/19/91; Decision, at 1. At that time, the Commission had not received a report from Inland/Wetlands; decision, at 1; rather, it had only received notice that Inland/Wetlands had returned the plaintiff's incomplete "application" and check. Record #12.
The Commission held monthly meetings at which they discussed CT Page 10680 the plaintiff's application. Supplemental Record #1, #2. At their meeting on January 21, 1992, the Commission accepted a letter from the plaintiff granting the Commission a sixty-five (65) day extension, pursuant to General Statutes § 8-26d, for the Commission's decision. Record #23; #24; Commission Minutes, dated 1/21/92; Decision, at 1. Said extension expired on March 28, 1992. Decision, at 1. At that time, however, the Commission still had not received a report from Inland/Wetlands; consequently, it could not render a decision on the plaintiff's application in accordance with General Statutes § 8-26. Decision, at 1.
On October 20, 1992, the Commission received a report from Inland/Wetlands regarding the plaintiff's subdivision application. Decision, at 1. Thereafter, at their meeting on November 17, 1992, the Commission voted to "deny" the plaintiff's application. Record #42; Decision, at 1. The Commission's decision denying the plaintiff's application was issued on November 23, 1992. Decision, at 1-3.
On December 10, 1992, the plaintiff filed a complaint against the Commission in the Superior Court, alleging that the actions of the Commission, as set forth above, were arbitrary, capricious, illegal, and/or an abuse of discretion.
II. AGGRIEVEMENT
Aggrievement, which is a jurisdictional question involving standing; DiBonaventura v. Zoning Board of Appeals, 24 Conn. App. 369,373, 588 A.2d 244 (1991), is a prerequisite to maintaining an appeal. Winchester Woods Associates v. Planning ZoningCommission, 219 Conn. 303, 307, 592 A.2d 953 (1991). An owner of the property which forms the subject matter of the application to the agency and appeal to the court is always aggrieved. Winchester,Woods Associates v. Planning Zoning Commission, supra, 219 Conn. 308;Bossert Corp. v. Norwalk, 157 Conn. 279, 285, 253 A.2d 39
(1968).
In the present case, the record reveals, and the Commission does not dispute, that the plaintiff is the owner of the property; in question. Accordingly, the court finds that the plaintiff is aggrieved pursuant to General Statutes § 8-8(a)(1) and, consequently, has standing to bring the within appeal.
III. SCOPE OF REVIEW
CT Page 10681
When a decision of an administrative agency is challenged, the burden of proving that the agency acted improperly is upon the plaintiff. Spero v. Zoning Board of Appeals, 217 Conn. 435, 440,586 A.2d 590 (1991). A court reviewing the decision of such an agency must focus on the record before the agency, as well as the decision issued by the commission below. Caserta v. Zoning Boardof Appeals, 226 Conn. 80, 82, 626 A.2d 744 (1993). In applying the law to the facts of a particular case, the agency is endowed with liberal discretion, and its decision will not be disturbed unless it is found to be unreasonable, arbitrary, or illegal. Spero v.Zoning Board of Appeals, supra, 217 Conn. 440. Thus, the question on appeal is simply whether the evidence in the record reasonably supports the agency's action, and the court cannot substitute its judgment as to the weight of the evidence for that of the agency.Goldberg v. Zoning Commission, 173 Conn. 23, 27, 376 A.2d 385
(1977).
Where the zoning authority has stated the reasons for its decision, the court is not at liberty to probe beyond them.DeMaria v. Planning Zoning Commission, 159 Conn. 534, 541,271 A.2d 105 (1970). However, the agency's action is to be sustained if any one of the reasons stated is sufficient to support the decision. Property Group, Inc. v. Planning Zoning Commission,226 Conn. 684, 697, 628 A.2d 1277 (1993); Daughters of St. Paul,Inc. v. Zoning Board of Appeals, 17 Conn. App. 53, 56-57,549 A.2d 1076 (1988).
Moreover, since the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency; Feinson v. Conservation Commission,180 Conn. 421, 425, 429 A.2d 910 (1980); the court must determine the correctness of the conclusions from the record on which they are based. Housatonic Terminal Corp. v. Planning Zoning Board,168 Conn. 304, 306, 362 A.2d 1375 (1975). That record may include knowledge acquired by board members through personal observation of the site. Burnham v. Planning Zoning Commission, 189 Conn. 261,267, 455 A.2d 339 (1983).
IV. CLAIMS OF THE PARTIES
In the present case, the plaintiff first argues that, because the Commission voted to deny its application after the time period required for decision making in General Statutes §§ 8-26 and 8-26d
had past, the Commission was under a legal duty to issue a permit to the plaintiff.[1] In response, the Commission argues that its CT Page 10682 decision was not untimely because, where an applicant is required to obtain Inland/Wetlands review of a proposed subdivision, the Commission is not obligated to issue a decision on the application until thirty-five days after it receives a report regarding the matter from Inland/Wetlands. In the present case, the Commission argues, Inland/Wetlands did not report the results of its subdivision review of the plaintiff's property until October 20, 1992. Thereafter, the Commission voted on the matter on November 17, 1992, and issued a memorandum of decision on November 23, 1992. Thus, the Commission argues, it acted within thirty-five (35) days of receiving the Inland/Wetlands report, which was in complete conformity with the applicable statutes.
Additionally, the plaintiff argues that the Commission's decision was illegal, arbitrary, capricious, and/or an abuse of discretion, because the Commission failed to properly interpret and; apply their own regulations as they relate to minimum buildable lot requirements and soil criteria. In response, the Commission argues that General Statutes § 8-6 entrusts a zoning commission with the function of interpreting and applying its regulations and where, as here, there is evidence to support the commission's interpretation of its regulations, the court may not substitute its judgment for that of the zoning commission.
Next, the plaintiff argues that the Commission's decision is invalid because it is based, at least in part, upon the fact that the town sanitarian had not approved the plaintiff's application, despite the fact that the Commission had waived any such requirement by accepting the plaintiff's application at their meeting of November 19, 1991, without enforcing such requirement, and despite the fact that the Commission knew that there had been, and continued to be, on-going discussions and cooperation with the town sanitarian. In response, the Commission argues that accepting an application without the Town Sanitarian's signature does not constitute a waiver of the requirement because: testing commonly continues throughout the review process; lot lines are frequently changed between application and final approval, and the Sanitarian does not sign the map until the lots are in their final form; the plaintiff never asked the Commission to waive this portion of the application requirements, despite the fact that the plaintiff requested that the Commission waive several other requirements set forth in the Regulations; and, most importantly, under § 4.5 of the Regulations, the requirement of obtaining the Town Sanitarian's signature and approval cannot be waived. CT Page 10683
Further, the plaintiff argues that the Commission's decision was illegal, arbitrary, capricious, and/or an abuse of its discretion, because said decision is based, at least in part, upon the fact that the lots in question were adjacent to an old landfill, despite the fact that all of the data properly before the Commission clearly indicated that no contamination was present nor could future contamination be reasonably anticipated. In response, the Commission argues that there is no expert opinion in the record before it which guarantees that there is no possibility of future pollution. Additionally, the Commission argues that where, as here, there is conflicting expert opinion in the record regarding the likelihood of future contamination, a commission may reach one conclusion from the evidence, even though another conclusion could also have been drawn, because the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.
Finally, the plaintiff argues that the Commission's action in accepting and relying upon ex parte evidence in rendering its decision, without giving the plaintiff adequate opportunity for rebuttal, constituted a violation of the plaintiff's due process rights. In response, the Commission agrees that it may not properly consider evidence submitted after a public hearing, unless appropriate safeguards are employed to protect the applicant's due process rights. The Commission distinguishes the within case, however, on the ground that, here, there was no public hearing regarding the plaintiff's application; rather, there were only a series of public meetings, which were held in accordance with the State's Freedom of Information laws.
V. DISCUSSION
A. The Commission's Decision was issued in a timely fashion.
General Statutes § 8-26 requires a planning commission to "approve, modify and approve, or disapprove" any subdivision application within the time limits set forth in General Statutes § 8-26d. A commission's failure to so act thereon, moreover, "shall; be considered an approval" of the subdivision application. VikingConstruction Co. v. Planning Commission, 181 Conn. 243, 246,435 A.2d 29 (1980). Thus, where, as here, a subdivision application is at issue and no public hearing is held, the commission must decide the application within sixty-five days after it is received, subject only to an extension of time from the applicant of up to an CT Page 10684 additional sixty-five days. General Statutes §§ 8-7d(b) 8-26d(b).
However, subsection (d) of General Statutes § 8-26d provides, in pertinent part, that:
 (d) Notwithstanding the provisions of this section, if an application involves an activity regulated pursuant to sections 22a-36 to 22a-45, inclusive [wetlands], and the time for a decision by a planning commission established pursuant to this section would elapse prior to the thirty-fifth day after a decision by the inland wetlands, the time period for a decision shall be extended to thirty-five days after the decision of such agency.
(Emphasis added.) General Statutes § 8-26d(d). Thus, where inland/wetlands action is required, the sixty-five day deadline set forth in General Statutes § 8-26d is stayed, and a planning commission need not act on an application until thirty-five days after a decision by the Inland/Wetlands Commission has been made. This rule enables the two commissions to coordinate their review, and assures that a planning commission will not act without input from inland/wetlands.
In the present case, on October 16, 1991, the plaintiff submitted an "application" to Inland/Wetlands. Record #11. In the section provided for proposed activity, however, the plaintiff responded "None." Record #11. Perplexed by the application, Inland/Wetlands returned both the application and the accompanying check with a letter notifying the plaintiff that if it wished to have the agency make a subdivision review, it would have to file a blue "review" form with the exact proposal outlined:
 Enclosed is your Application to conduct a regulated activity in Wetlands or Watercourses, the subdivision map of Indian Springs, and check #6663. After reviewing the application, members did not find a regulated activity proposed for the subdivision at this time.
 If you would like the subdivision reviewed for possible wetlands impact, please submit the blue "review" form with exact proposal outlined.
Supplemental Record #3a: Letter to plaintiff from Inland/Wetlands, dated October 25, 1991. The plaintiff, however, did not respond to this letter. CT Page 10685
Rather, on November 19, 1991, the plaintiff submitted to the Commission its application for approval of the four-lot subdivision. Record #11. At this time, the Commission had in its possession a letter from Inland/Wetlands stating that:
 The Inland Wetlands Commission received a permit request for Lots 1-4 of Indian Spring[s] Subdivision about a month ago. The application did not have s[u]fficient information and was returned to the developers. Since that time there has been no further conversation with Par Developers.
Record #12 Supplemental Record #3b: Letter to Commission from, Wayne Addy, Chairman of Inland/Wetlands, received November 19, 1991. The record makes clear, however, that neither the Commission nor Inland/Wetlands considered this letter from Inland/Wetlands to be a "decision" regarding wetlands review of the plaintiff's subdivision application:
 The Killingworth Inland Wetlands and Watercourses Commission does not have before it any action, either request for review or permit application, for the above referenced project. The previous note and this letter are for coordination only and neither correspondence should be construed as a formal report as required by Connecticut statutes.
Record #34 Supplemental Record #3e: Letter to Commission from Wayne Addy, Chairman of Inland/Wetlands, received July 7, 1991.
During the pendency of its review, the Commission made numerous inquiries of Inland/Wetlands to determine whether the plaintiff had requested subdivision review. In each instance, the response was that the plaintiff had not yet applied to Inland/Wetlands for subdivision review:
 Please be advised that the developers have not submitted an application for review/permit with the Wetlands commission as of this date. Since these lots are of special concern, neighboring the Hammonas[s]ett River and containing wetlands as specified on the town wetlands maps, this commission would like to be sure that it has an input prior to any permits being issued for these properties. CT Page 10686
Record #28 Supplemental Record #3c: Letter to Commission from Wayne Addy, Chairman of Inland/Wetlands, dated March 10, 1992.
 This commission has not forwarded information to your commission on the Indian Springs Subdivision because we have received no permit applications or requests for review on any project. There is no review of any kind in process at this time.
Record #32 Supplemental Record #3d: Letter to Commission from Wayne Addy, Chairman of Inland/Wetlands, dated June 2, 1992.
Further, the record indicates that, on March 17, 1992, the plaintiff itself did not consider the October 16, 1991 submission to Inland/Wetlands to be the required application. Evidence of this fact is provided in the Minutes of the Commission's March 17, 1992 meeting, when Chairman Lentz informed the plaintiff's attorney as follows: "[T]here was no report from Inland/Wetlands, therefore, no decision can be made at this time — one can be made 35 days after the decision of Inland/Wetlands." In response, the plaintiff's attorney, John Gorman, stated that he would go before Inland/Wetlands and then come back to the Commission. Commission Minutes, dated 3/17/92. Certainly, Attorney Gorman would have informed the Commission at that time if he believed that the required submission to Inland/Wetlands had already been made. See also Commission Minutes, dated 10/8/91, 10/22/91, 10/28/91, 11/12/91, 11/26/91, 12/10/91, 2/4/92, 3/17/92, 5/5/92, 5/19/92, 6/2/92, 6/16/92, 7/7/92, 7/21/92, 8/4/92, 8/18/92, 9/1/92, 9/15/92, 10/6/92, 10/20/92; and supplemental record #6: Minutes of Inland/Wetlands, dated 3/10/92 and 6/23/92, for additional references to the fact that neither the Commission nor Inland/Wetlands believed that the plaintiff had requested subdivision review prior to June 23, 1992, and that a report on the matter by Inland/Wetlands was not received by the Commission until October 20, 1992.
On June 23, 1992, the plaintiff filed the appropriate application with Inland/Wetlands for wetlands review of its proposed subdivision. Supplemental Record #7. On October 20, 1992, Inland/Wetlands reported the results of its subdivision review to the Commission. Record #36; Commission Minutes, dated 10/20/92. The Commission then acted on the plaintiff's subdivision application within thirty-five (35) days of that date, voting on the matter on November 17, 1992; commission minutes, dated CT Page 10687 11/17/92; and issuing a memorandum of decision on the matter on November 23, 1992. Decision, at 1-3.
The Court finds that the Commission's actions in doing so were in complete conformity with the applicable statutes as set forth above. Accordingly, the Court declines to sustain the plaintiff's appeal on the ground that the Commission's decision was untimely.
B. The Commission properly interpreted its Regulations.
General Statutes § 8-6 entrusts a zoning commission with the function of interpreting and applying its zoning regulations.Toffolon v. Zoning Board of Appeals, 155 Conn. 558, 560,236 A.2d 96 (1967). Thus, it is the function of a zoning commission to decide, within prescribed limits and consistent with the exercise of its legal discretion, whether a particular section of a zoning regulation applies to a given situation, as well as the manner in which it applies. Schwartz v. Planning Zoning Commission,208 Conn. 146, 152, 543 A.2d 1339 (1988).
As a general rule, great deference is accorded to the construction of regulations given by the agency charged with its enforcement. EIS, Inc. v. Board of Registration, 200 Conn. 145,148, 509 A.2d 1056 (1986). However, because the interpretation of provisions in a zoning ordinance is ultimately a question of law for the court, the court is not bound by the legal interpretation of the ordinance by the town. Coppola v. Zoning Board of Appeals,23 Conn. App. 636, 640, 583 A.2d 650 (1990). Rather, it is for the court to determine whether the agency correctly interpreted the regulation and applied it with reasonable discretion based on the facts presented. Thorne v. Zoning Board of Appeals, 156 Conn. 619,620, 238 A.2d 400 (1968); Pascale v. Board of Zoning Appeals,150 Conn. 113, 117, 186 A.2d 377 (1962).
Nonetheless, the trial court may not properly sustain the plaintiff's appeal, unless it determines that the decision of the commission was unreasonable, arbitrary or illegal. Schwartz v.Planning Zoning Commission, supra, 208 Conn. 152. Thus, the court may not substitute its judgment for that of the zoning commission, and may not disturb decisions of local commissions, so long as honest judgment has been reasonably and fairly exercised.Baron v. Planning Zoning Commission, 22 Conn. App. 255, 257,576 A.2d 589 (1990).
In the present case, the Commission's Decision states that CT Page 10688 one of the reasons for denying the plaintiff's application is that three of the plaintiff's four lots do not contain the minimum building lot dimensions, as required by the applicable zoning regulations. Specifically, the Commission's decision pointed out that:
 1. Lots 1, 2, and 3 do not meet the minimum buildable lot area as required under § 61B of the Zoning Regulations. The required minimum lot area is a two acre equivalent minimum buildable lot area as defined in § 61B of the Zoning Regulations. As required under § 7.2.1(f) of the Subdivision Regulations, a plan shall not be considered to meet the standards prescribed in § 7.2 unless the layout and design complies with Zoning or Inland Wetland Regulations.
Decision, at 1.
Section 61B of the Zoning Regulations states, in pertinent part, that:
 The minimum lot area of two acres shall be considered as an underlying or basic lot size The Soil Survey of Middlesex County prepared by the Soil Conservation Service of the United States Department of Agriculture and the Middlesex County Cooperative Extension Service describe soil characteristics and limitations of soil types for septic tank absorption fields by reason of high ground water table, shallow depth to ledge rock, excessive slopes, excessive stoniness, poor filter, poor permeability, proximity to existing wetlands or watercourses, flooding or other physical characteristics. Soil Interpretations for Waste Disposal, The Connecticut Agricultural Experiment Station, Bulletin 776 describes the potential of design and management practices for overcoming the limitations. Limitations and potentials of soils are listed in Appendix A. The description of soil characteristics, limitations, and potential in the Soil Survey of Middlesex County and Soil Interpretation for Waste Disposal are hereby made a part of these Regulations. The maps of the Soil Survey of Middlesex County are incorporated as part of these regulations and shall be presumed to show the correct soil classification of land in the Town of Killingworth. This presumption may be rebutted by an applicant based upon a detailed CT Page 10689 soil survey made by a Commission-approved qualified engineer or soil scientist at the applicant's expense
 In order to maintain the quality of surface and ground waters and the open space character of the Town and to protect the public health and safety, natural resource characteristics and suitability of soils for septic tank absorption fields shall be considered in determining a two acre equivalent minimum buildable lot area. The contribution to the minimum buildable lot area by areas of the lot exhibiting the natural resource characteristics listed below shall be determined by multiplying the area in acres occupied by each resource characteristic by the indicated percentage. The minimum buildable lot area requirement is met when the sum of the contributions of all resource characteristics is at least two (2) (See Appendix B). At least one and a half (1 1/2) acres of the minimum buildable lot area shall be composed of a soil (s) belonging to Class A, B, C or D.
In the case of soils with limitations for septic tank absorption fields, management practices are required to overcome the limitations.
(Emphasis added.) Thus, under § 61B of the Regulations, only a percentage of the area of soils with limited development potential — due to such characteristics as high ground water table, shallow depth to ledge rock, excessive slopes, excessive stoniness, and poor permeability — count toward the two (2) acre minimum lot size. Percentages are determined by the following soil classification system: Soils in class A are counted at 100% of actual area, in B at 75%, C at 50%, D at 50%, and E at 25%. Further, the area of ponds, lakes, and watercourses do not count toward minimum lot size. Zoning Regulations (Appendix A).
Interpreting and applying the regulation set forth above to the instant matter, the Commission determined that the plaintiff's proposed subdivision had the following lot sizes: Lot #1: 1.16 acres; Lot #2: 1.96 acres; Lot #3: 1.03 acres; Lot #4: 2.36 acres. Commission Minutes, dated 11/17/92.[2] Consequently, the Commission determined, only lot #4 conformed to the lot size required by the Regulations. Id.
For this Court to now conclude otherwise would entail substituting its judgment in this regard for that of the Commission. This, the Court declines to do. The record indicates CT Page 10690 that the Commission considered the applicable regulations. Further, an objective reading of § 61B does not refute the Commission's conclusion. Accordingly, the Court declines to sustain the plaintiff's appeal on the ground that the Commission misinterpreted its Regulations.
C. The Commission did not waive the requirement that the Town Sanitarian sign, and approve, the plaintiff's subdivision map. 
Another reason given by the Commission in its decision denying the plaintiff's subdivision application is that: "[t]he application has not been approved by the Sanitarian as required under § 4.4.6 of the Subdivision Regulations." Decision, at 2.
Section 4.4 of the Subdivision Regulations, and the subparts thereto which follow, outline the supporting data which must be submitted with a subdivision application. In particular, § 4.4.6 requires, in pertinent part, as follows:
 Sanitation Certificate and Data: Except when the plan Area is to be served by a municipal sewer system: an endorsement on the Record Subdivision Map signed by the Director of Health or the Sanitarian stating that each part or lot within the Plan Area used or to be used for a building site is satisfactory for a private subsurface sewage disposal and water supply system . . . .
Supplemental Record #10: Subdivision Regulations, §§ 4.4 4.4.6. Thus, the Sanitarian's signature gives evidence of his assurance that all proposed lots will support both a septic system and a well.
In the present case, the plaintiff does not dispute the fact that the Town Sanitarian did not sign its subdivision map; rather, the plaintiff contends that, by accepting the plaintiff's application at its November 19, 1991 meeting, the Commission waived[3] the requirement that the plaintiff obtain such signature and approval. That is, the plaintiff argues that, by accepting the, application without the Sanitarian's signature, the Commission was then required to approve the subdivision without the signature. The Court finds that there is no reason for such an assumption.
First, according to the Commission, testing commonly continues throughout the review process; therefore, there is no reason for the Sanitarian to sign the map prior to Commission review. CT Page 10691 Additionally, because lot lines are frequently changed between application and final approval, the Sanitarian often does not sign the map until the lots are in their final form.
Moreover, although the plaintiff requested that the Commission waive several requirements imposed by the Regulations, the plaintiff never asked the Commission to waive this portion of the application requirements. Record #11; #18. Further, although § 4.5 of the Subdivision Regulations provides that certain, specified requirements regarding subdivisions may be waived, § 4.4.6 is not one of the sections so specified. To the contrary, § 4.5 explicitly states that an applicant may not request a waiver of the information prescribed in § 4.4.6. Thus, the Subdivision Regulations themselves preclude a waiver of the requirement that an applicant obtain the signature, and approval, of the Town Sanitarian. Supplemental Record #10: Subdivision Regulations, § 4.5.
Finally, the record clearly indicates that the Sanitarian was not satisfied with the plaintiff's submission. On November 10, 1992, for example, the Sanitarian notified the Commission that the plaintiff had failed to respond to a letter he had mailed to the plaintiff's engineer on or about September 18, 1992. Record #38. Said letter outlined "numerous problems" with testing on each of the lots, and is evidence that none of the four lots had proven the capacity to support both a septic system and a well at that stage of testing. Id. See also Record #31; #35; #45; and supplemental record #3f.
For all of the reasons set forth above, the Court declines to find that the Commission waived the requirement, set forth in § 4.4.6 of the Regulations, that the plaintiff obtain the Sanitarian's certification on its subdivision map. Accordingly, the court declines to sustain the plaintiff's appeal on this ground.
D. There is substantial evidence in the record to support the Commission's conclusion that the plaintiff has failed to establish that the subject land can be used for building purposes without danger to health or that proper Provision can be made for a safe water supply.
Section 1.2 of the Subdivision Regulations provides, in pertinent part, as follows: CT Page 10692
 It is hereby declared to be the purpose of the Regulations hereinafter set forth to regulate the subdivision of land within the Town of Killingworth so . . . that:
 (a) The land can be used for building purposes without danger to health or peril from fire, flood or other menace;
 (b) Proper provision can be made for water supply, storm drainage and safe and sanitary disposal of sewage . . .
Supplemental Record #10: Subdivision Regulations, § 1.2.
Another reason given by the Commission, in support of its decision to deny the plaintiff's application, is that, because the subject lots are adjacent to an old landfill:
 an element of hazard remains regarding on-site water supply systems, . . . [and] the Commission is not assured [that] the land can be used for building purposes without danger to health or that proper provision can be made for a safe water supply as specified under §§ 1.2(a) and 1.2(b) of the Subdivision Regulations.
Decision, at 2-3. In reaching this conclusion, the Commission states that it relied upon the following documentary evidence: (1) a report by the Eastern Connecticut Resource Conservation and Development Area Environmental Review Team, dated June, 1980 ("ERT Report"); (2) a letter from Paul Marin, Principal Environmental Analyst, Water Compliance Unit, Department of Environmental Protection, dated April 23, 1981 ("DEP Report"); (3) a letter from Michael Powers, Principal Sanitary Engineer, Hazardous Materials Management Unit, Department of Environmental Protection, dated July 13, 1989 ("Powers Letter") and the accompanying Preliminary Assessment Report, dated June 27, 1989 ("Preliminary Assessment Report"); (4) a letter from William Warzecha, Senior Environmental Analyst, Department of Environmental Protection, dated June 4, 1991 ("Warzecha Letter"); (5) a report by Ground Water, Inc., dated April 1991, submitted by the plaintiff to the Commission on November 25, 1991 ("Marin Report"); and (6) a report by Normandeau Associates, dated January 13, 1992 ("Normandeau Report").
The plaintiff argues that the Commission's conclusions regarding this issue, as set forth above, are illegal, arbitrary, CT Page 10693 capricious, and/or an abuse of discretion, in light of the expert opinion concerning the issue which exists in the record. That is, the plaintiff argues that a review of those materials relied upon by the Commission can only support approval of the plaintiff's subdivision application.
It is true, as the plaintiff points out, that a lay commission's decision is not supported by substantial evidence when it relies on its own knowledge and expertise concerning technically complex issues, despite the fact that all of the expert opinion in the record points to the opposite conclusion, unless said commission affords a timely opportunity for rebuttal of its point of view. Feinson v. Conservation Commission, supra, 180 Conn. 429. See also Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525,542, 552, 525 A.2d 940 (1987). Additionally, an administrative agency must not disregard the only expert evidence available on the issue when the Commission members lack their own expertise or knowledge. Tanner v. Conservation Commission,15 Conn. App. 336, 341, 544 A.2d 258 (1988).
However, where, as here, conflicting and inconsistent expert opinion exists in the record regarding a particular issue, a zoning commission is entitled to draw one conclusion from said expert opinion, despite the fact that a different conclusion could just as easily have been reached. "The reviewing court must take into account [that there is] contradictory evidence in the record . . . but `the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . .'" (Citations omitted; internal quotation marks omitted.) Huck v. InlandWetlands Watercourses Agency, supra, 203 Conn. 542. See also ParDevelopers, Ltd. v. Planning Zoning Commission, Memorandum of Decision, Superior Court, judicial district of Middlesex, at Middletown, Docket No. 35425, at 6-7 (November 8, 1983, Hale, J.) (indicating that the rule in Feinson, prohibiting a lay commission from substituting its opinion for that of an expert, does not apply unless the expert opinion is clear and uncontroverted).
In the present case, there is substantial evidence in the documents relied upon by the Commission, in the form of expert opinion, to support the Commission's conclusion that the landfill poses a safety risk to the property in question. The ERT Report, dated June, 1980, for example, states, in pertinent part, as follows: CT Page 10694
 Water is proposed to be supplied to lots in the subdivision by individual on-site wells. The major concern regarding such supply is the possibility of groundwater contamination from the old town landfill, which is located immediately west of lot 1 and south of lot 2. . . . Mr. Marin stipulated that some wells drilled in the putatively safe zone might still be subject to leachate contamination since the directions of groundwater flow in the bedrock underlying the site could not be conclusively determined.
. . .
 On the basis of Mr. Marin's report and the evidence of major fracture orientations to the east-southeast, the Team concludes that a well drilled on proposed lot 2 would be subject to a high risk of leachate pollution, the risk being lowest in the northeast section of the lot; and that a well on proposed lot 1 would be subject to a moderate risk of contamination if drilled in the rocky, eastern section, and a high risk of contamination if drilled in the low-lying, western section. Moderate risks would exist for wells drilled in the western section of lot 3 and the southern section of lot 4.
Record #3: ERT Report, at 15.
Similarly, the DEP Report, dated April 23, 1981, states, in pertinent part, as follows:
 In summary, I feel that the test wells on Lots 1 and 3 are outside the zone of influence of landfill leachate. The test well on Lot 2 may possibly be within the zone of influence of landfill leachate under pumping conditions. And, finally, the situation at Lot 4 is dependent upon the outcome of the further testing on Lot 2. If test well on Lot 2 is found to be free of any influence from the landfill, then the well on Lot 4 would be so also. On the other hand, if the well, on Lot 2 is found to be influenced by landfill leachate, then the pump test procedure as outlined herein would have to be run for the well on Lot 4.
Record #9: DEP Report, at 2. CT Page 10695
Additionally, the Powers Letter, and accompanying Preliminary Assessment Report, state, in pertinent part, that:
 Being adjacent to the old landfill site, . . . [lots 1-4] are either in the surface water or groundwater pathways of the site. . . . Groundwater at the site is classified GB/GA. The groundwater is presumed to be unsuitable for direct human consumption without prior treatment.
. . .
 Testing between the years of 1980 and 1988 determined Lots 1, 3, and 4 were outside of the zone of landfill leachate influence. . . . As a result of the potential private well hazard and the proximity of the Hammonasset River, [however], a medium priority SSI is recommended.
Record #4: Preliminary Assessment Report, at 4, 7-8.
Moreover, the Warzecha Letter, dated June 4, 1991, states, in pertinent part, as follows:
 Leachate production increases during the operating life of a landfill and peaks a few years following its closure but can expect to persist in gradually decreasing concentrations for many years. If further testing reveals no water quality problems but does indicate hydraulic connection between ground water beneath lots 2 and 4 and the adjacent landfill, there is concern that wells may be adversely impacted at some point in the future.
Record #9: Warzecha Letter, at 1.
Further, although the Marin Report, dated April 1, 1991, states that "[w]e have found no evidence to indicate that the wells on . . . lots [2 and 4] are affected by leachate from the adjacent former landfill"; record #7: Marin Report, at 1; the Report goes on to state, in pertinent part, that:
 The pump testing data [from September 1981 to September 1988] showed a possible, hydraulic connection between well #2 and the groundwater in the shallow bedrock observation well immediately adjacent to the landfill.
CT Page 10696 . . . [T]he ground water at and hydraulically downgradient of the landfill is designated as "GB/GA," signifying that it is not currently suitable for consumption without treatment.
(Emphasis added.) Record #7: Marin Report, at 4-6.
 The former landfill shown on Figure 2 is the known source of pollution to ground water in the area. . . . Being situated at the foot of a fairly large hill, and adjacent to a major stream it is reasonable to assume that regional groundwater flow is generally away from the hill and toward the major stream (i.e. generally west).
. . .
 A small intermittent stream flows between the landfill and well #2. This small stream probably controls shallow ground water flow in the immediate area by acting as a drain for shallow ground water. Thus, nearby shallow ground water flow is generally toward the intermittent stream from all directions.
(Emphasis added.) Record #7: Marin Report, at 8-9.
 [In summary], [w]e have found little substantive evidence of a hydraulic connection between well #2 and the groundwater beneath the landfill . . . [and] . . . [i]t is our professional opinion that well #2 may be used for domestic water supply to a single family house without significant risk of inducing landfill contamination.
(Emphasis added.) Record #7: Marin Report, at 16 Appendix 3.
Finally, although the Normandeau Report, dated January 13, 1992, states, in pertinent part, that:
 [t]he studies to date have not proven that there is a hydrologic connection between well #2 and groundwater under the landfill, . . . [said report concedes that] . . . [m]ost conclusions are based on assumed groundwater flow directions, . . . [despite the fact that] [g]iven the bedrock geology constraints mentioned earlier, the well network is not sufficient to definitively establish actual groundwater flow nor CT Page 10697 determine if the landfill is presently affecting the down-gradient bedrock aquifer.
(Emphasis added.) Record #21: Normandeau Report, at 2. Additionally, the Normandeau Report, like the other reports outlined above, failed to state that no risk to health and safety would result from the plaintiff's proposed subdivision plan:
 Based on the studies conducted to date, it is our opinion that the risk associated with the use of well #2 is exceedingly small. More risk may be involved in pumping both well #2 and well #4 simultaneously, however the data available indicate that this risk is also small.
Record #21: Normandeau Report, at 3.
Based on the above excerpts from the various reports in the record, the Court agrees with the Commission that the expert opinion in this case, regarding the likelihood that the landfill could pose a danger to the health and safety of individuals, in the event that lots one through four are developed as proposed, is anything but clear. First, the expert opinion in the record only accounts for tests that have been made to date. Additionally, no expert opinion before the Commission states that there is no possibility of future pollution, and no expert opinion before the Commission conclusively establishes that there is no hydraulic connection between lots 2 and 4 and the landfill. To the contrary, expert reports in the record reveal substantial doubt about the direction of underground water flow, the effect of pumping on contamination, and the future quality of effluent from the old landfill. For these reasons, none of the experts was able to definitively conclude that there is no possibility that wells on Lots 1-4 will be polluted by leachate from the old landfill.
Based on the record before it, the Court concludes that the Commission' findings that: 1) "it has not been shown that lots 2 and 4 are not hydraulically connected to the landfill"; 2) "[t]he nature of the materials buried in the landfill are unknown"; 3) "[t]he actual groundwater flow directions have not been sufficiently established"; 4) "[t]he possibility of leachate influence on wells in the future under continued long term pumping cannot be ruled out"; and 5) "an element of hazard remains regarding on-site water supply systems," all have ample support in the record. Further, the Court finds that the Commission's conclusion, that it "is not assured [that] the land can be used for CT Page 10698 building purposes without danger to health or that proper provision can be made for a safe water supply as specified under Sections 1.2(a) and 1.2(b) of the Subdivision Regulations," is entirely reasonable. Accordingly, the Court declines to sustain the plaintiff's appeal on this ground as well.
E. The plaintiff's due process rights have not been violated.
In the present case, it is undisputed that, by letter dated November 5, 1991, the Chairman of the Commission requested that Normandeau Associates, a private consulting group, "give an independent assessment of th[e] data" set forth above; record #10; and that said report was received by the Commission in January, 1992. Record #21. Further, it is undisputed that the Commission had before it the Normandeau Associates Report during at least one of their meetings wherein they discussed the plaintiff's application. See, e.g., Commission Minutes, dated 11/17/92.
The plaintiff further alleges, however, that: it never received the Normandeau Report prior to the return of record; it was never made aware of the existence of the report by the Commission at any of their meetings; and it was never afforded an opportunity to rebut the report. It follows, the plaintiff argues, that the Commission improperly accepted ex parte evidence, and relied upon said evidence in rendering its decision, in violation of the plaintiff's due process rights.
In response, the Commission argues that where, as here, no public hearing is held[4] and a series of public meetings are held instead, the Commission need only act, as it has done, in accordance with the State's Freedom of Information laws in order to satisfy the plaintiff's due process rights. Supplemental Record #1: Copies of Agenda; Supplemental Record #2: Minutes of the Commission filed with the Town Clerk. It follows, the Commission argues, that if the plaintiff was unaware of any documentation it was considering in regards to the plaintiff's application, such unawareness was due solely to the plaintiff's own inaction. Along the same lines, the Commission argues that if the plaintiff did not have an opportunity to inspect, challenge, explain and/or rebut the Normandeau Report, said lack of opportunity was due solely to the plaintiff's own inaction.
The plaintiff is correct in its assertion that, as a general rule, an agency cannot properly consider additional evidence submitted by an applicant after a public hearing unless necessary CT Page 10699 safeguards are guaranteed to opponents of the application and to the public; these safeguards include a fair opportunity to cross-examine witnesses, to inspect documents presented, and to offer evidence in explanation or rebuttal. Blaker v. Planning ZoningCommission, 212 Conn. 471, 478, 562 A.2d 1093 (1989). See alsoConnecticut Fund for the Environment, Inc. v. Stamford, 192 Conn. 247,249, 470 A.2d 1214 (1984) ("[d]ue process of law requires not only that there be due notice of the hearing but that at the; hearing the parties involved have a right to produce relevant evidence, and an opportunity to know the facts on which the agency is asked to act, to cross-examine witnesses and to offer rebuttal evidence").
Indeed, the illegal receipt and consideration of evidence submitted after the public hearing can invalidate the agency's action. See Pizzola v. Planning Zoning Commission, 167 Conn. 202,207, 208, 355 A.2d 21 (1974). Where it has been established that a local commission has improperly accepted ex parte evidence, a rebuttable presumption of prejudice arises with the burden to show no prejudice, from the record, on those seeking to uphold the validity of the Commission's decision. Blaker v. Planning ZoningCommission, supra, 212 Conn. 480; Palmisano v. ConservationCommission, 27 Conn. App. 543, 547, 608 A.2d 100 (1992).
An exception to the general rule stated above has been recognized, however, where an administrative agency obtains professional assistance after the public hearing from its staff and consultants, such as engineers, planners and attorneys, in order to carry out its responsibility of evaluating the application before; it. See, e.g., McCrann v. Town Plan Zoning Commission, 161 Conn. 65,77-78, 282 A.2d 900 (1971) (fact that planning consultant, who had previously spoken in favor of the site plan being considered, met in executive session with agency subsequent to public hearing, found insufficient to invalidate agency's decision); Holt-Lock,Inc. v. Zoning Planning Commission, 161 Conn. 182, 184-85,286 A.2d 299 (1971) (fact that agency requested and considered a report from an outside planning consultant, subsequent to the public hearing, found insufficient to invalidate agency's decision); Kyserv. Zoning Board of Appeals, 155 Conn. 236, 249-51, 230 A.2d 595
(1967) (fact that two municipal officials were called into the agency's executive session to explain certain discrepancies in the record, subsequent to the public hearing, found insufficient to invalidate agency's decision); Yurdin v. Town Plan ZoningCommission, 145 Conn. 416, 420-21, 143 A.2d 639, cert. denied,358 U.S. 894, 79 S.Ct. 155, 3 L.Ed.2d 121 (1958) (fact that agency CT Page 10700 conferred in executive session with the town planning director and the town planning technician, in order to obtain an explanation of certain evidence in the record, subsequent to the public hearing, found insufficient to invalidate agency's decision).
This exception presupposes, however, that the person making post hearing comments to the agency has no interest in the application. Kyser v. Zoning Board of Appeals, supra, 155 Conn. 250-51. Moreover, a further restriction on the technical assistance rule described above was recently imposed by the appellate court in Norooz v. Inland Wetlands Agency, 26 Conn. App. 564,573-74, 602 A.2d 613 (1992): "The proper inquiry for a reviewing court, when confronted with an administrative agency's reliance on nonrecord information provided by its technical or professional experts, is a determination of whether the challenged material includes or is based on any fact or evidence that was not previously presented at the public hearing in the matter."
In the present case, the record establishes, and the plaintiff does not dispute, that all of the Commission's meetings held during the time in which the plaintiff's application was being considered were held in accordance with the State's Freedom of Information laws. Additionally, the plaintiff does not dispute that its representatives were free to attend any meeting they chose. Along the same lines, the plaintiff does not dispute that the Zoning Enforcement Officer has office hours at the Town Hall two mornings each week, and that the plaintiff was free to call, visit, and/or review the entire file upon request.
Further, the record establishes that the Commission actually requested in writing that the plaintiff attend its meetings on at least two separate occasions. Record #26, #29, #37. See also Commission Minutes, dated 3/3/92. As a result, agents of the plaintiff attended both the March 17, 1992 meeting and the November 19, 1992 meeting. Commission Minutes, dated 3/17/92 11/19/92. Finally, the record establishes that the plaintiff was not onlypresent at the meeting in which the Commission deliberated and voted upon the plaintiff's application, wherein the NormandeauReport was discussed at length, but was also invited to participate
at said meeting. Commission Minutes, dated 11/17/92.
For the plaintiff to now argue that its due process rights have been violated, under the facts as set forth above, defies logic. Even assuming, moreover, that the plaintiff is entitled to the same due process protections during and after a public meeting
CT Page 10701 as an applicant is entitled to during and after a public hearing,
the Normandeau Report was nonetheless properly considered and relied upon by the Commission in rendering its decision.
Here, as in Norooz, supra, the plaintiff has failed to identify any fact or piece of evidence in the Normandeau Report which was not already evidence in the record before the Commission. This court's review of the Normandeau Report, moreover, reveals that it is limited solely "to a review of, a comment on, and an opinion concerning evidence [already] of record." Norooz v. InlandWetlands Agency, supra, 26 Conn. App. 574. Indeed, the Normandeau Report itself explicitly states that its "assessment was a `desktop evaluation' of existing information" before the Commission,[5] and that it "did not design, consult on, or conduct any of the assessments or sampling which were reviewed during this project"; record #21: Normandeau Report, at 1. Further, there is nothing in the record to suggest, nor does the plaintiff argue, that Normandeau Associates had any interest in the plaintiff's subdivision application.
Finally, in the case of Reed v. Planning Zoning Commission,208 Conn. 431, 544 A.2d 1213 (1988), the Connecticut Supreme Court stated that:
 [a] municipal planning commission, in exercising its function of approving or disapproving any particular subdivision plan, is acting in an administrative capacity and does not function as a legislative, judicial or quasi-judicial agency, which would require it to observe the safeguards, ordinarily guaranteed to the applicants and the public, of a fair opportunity to cross examine witnesses, to inspect documents presented, and to offer evidence in explanation or rebuttal and of the right to be fully apprised of the facts upon which action is to be taken . . . .
(Citations omitted.) Id., 433.
For all of the reasons stated herein, the Court declines to sustain the plaintiff's appeal on the ground that the Commission improperly considered ex parte evidence in rendering its decision.
Accordingly, the appeal is dismissed.
BY THE COURT, CT Page 10702
HIGGINS, J.