[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The appellants (hereafter "Gelfman") have appealed, pursuant to § 8-8(b) of the General Statutes, from two decisions of the defendant, Planning Zoning Commission of the Town of Ridgefield (hereafter "Commission"), that granted planned residential development designation (PRD), and later approved the subdivision application of defendant, Robert Cioffoletti. This appeal, the PRD appeal, was instituted by Gelfman and attacks the Commission's granting PRD designation to Cioffoletti by service of process on the Commission and Cioffoletti. Two days later, the subdivision appeal was begun, challenging the Commission's subdivision approval. The court has previously granted the Commission's motion to consolidate appeals.
Gelfman alleges that the Commission acted unlawfully, illegally, arbitrarily and in an abuse of its discretion by granting Cioffoletti PRD designation, and later approving his subdivision application. They argue that with respect to the PRD designation, the Commission erred in (1) failing to require Cioffoletti to obtain a written report from the town sanitarian concerning appropriate locations for a septic system under § 308.0C(4) of the Ridgefield Code; (2) failing to require Cioffoletti to submit updated soil test data under § 308.0F of that code; and, (3) improperly allowing Cioffoletti to construct an eight lot PRD when only seven lots would be allowed pursuant to § 308.0G.
Addressing the Commission's granting of subdivision approval to Cioffoletti, they assert that the Commission's decision is erroneous since (1) it failed to require Cioffoletti to submit an inland wetlands application simultaneously with his subdivision application as required by § 8-26 of the General Statutes; (2) it impermissibly determined that the subdivision could be constructed without danger to public health or safety under §1-3 of the Ridgefield Code; (3) it failed to solicit a report from the health commissioner concerning water quality under § 6-6(g) of that code; (4) it failed to require Cioffoletti to submit as part of his application a title certificate as required by § 6-6(f) and a construction cost breakdown pursuant to § 6-6(h); and, (5) it violated their due process rights by allowing Cioffoletti to submit amendments to his subdivision application, after commencement of the public hearings, in CT Page 254 violation of § 8-26 of the General Statutes.
The Commission and Cioffoletti have been involved in extensive litigation over the site where Cioffoletti would like to develop the PRD subdivision. Prior to deciding that a residential development would be appropriate, Cioffoletti conducted a sand and gravel operation on the land. Cioffoletti v.Planning Zoning Commission, 209 Conn. 544, 548. The Appellate Court ruled that the gravel pit was a valid nonconforming use.Cioffoletti v. Planning Zoning Commission, 24 Conn. App. 5, 6.
On August 25, 1994, in order to resolve all the pending litigation concerning the property, the parties entered into a stipulation which provides that within three months of the granting of PRD designation and a subdivision approval for the property, Cioffoletti will cease and desist from continuing his sand and gravel operations on the property. Should the designation and approval not be granted, then the stipulation was to be voidable at the option of either party.
On September 1, 1994, Cioffoletti filed the PRD and subdivision applications. On September 7, 1994, the Commission acknowledged receipt of the application and set the matter down for a public hearing on October 11, 1994. On September 7, 1994, the Commission, sitting as the Inland Wetlands Board, acknowledged receipt of the map of the proposed subdivision.
On September 11, 1994, the Commission called a special meeting to walk the proposed PRD subdivision. On October 11, 1994, a duly noticed public hearing was held concerning Cioffoletti's application. The published hearing notice indicated that "[m]aps and details for above are on file in the Planning and Zoning Office."
The testimony at the hearing revealed that a map was submitted by Cioffoletti indicating the location of wetlands on the property. The soil scientist who prepared the map "was selected by the Town to come up with [the] wetland markings."
During the hearing, letters from the town sanitarian were read into the record. Those letters indicate that the sanitarian had "reviewed and approved plans for a proposed 8 lot subdivision for Robert Cioffoletti, North Salem Road." Additional testimony was taken from members of the public, including Mary Hughes Boyce Gelfman, concerning the impact of the proposed PRD subdivision. CT Page 255 Thereafter, the hearing was continued until November 1, 1994, to give the appellants herein an opportunity to appear at the public hearing represented by counsel and to allow Cioffoletti to submit additional information concerning the PRD subdivision. The items to be produced by Cioffoletti were recited during the hearing.
In response to the request by the Commission for additional information, Cioffoletti submitted a "Hydrology Report and Drainage Calculations," water test results; a map dated October 24, 1994, delineating the wetlands on the property; a map dated October 24, 1994, indicating the location of condemned wells on the property; a map dated October 24, 1994, indicating lot boundaries; and a map dated October 24, 1994, indicating accessways to the property. In addition, a map dated April 22, 1983, indicating the location of wetlands at that time was submitted. On October 20, 1994, prior to the continued hearing, members of the Conservation Commission, accompanied by Cioffoletti, walked the proposed subdivision in order to elicit input at the adjourned hearing from the Conservation Commission concerning Cioffoletti's proposal. On November 1, 1994, the public hearing on the matter continued. Testimony was elicited concerning the wetlands on the property. With respect to the pond contained in the tract, Cioffoletti testified, through his engineer, that the pond would be conveyed to the Conservation Commission as part of the open space on the property.
After Cioffoletti's presentation, the Gelfmans presented their case to the Commission through their attorney. (Hereafter "Attorney Fallon"). He argued that since the subdivision proposal envisions the discharge of storm water and "other materials" into the pond, the proposal contains a "regulated activity" that must, pursuant to § 8-26 and § 4-33 of the Ridgefield Code, be reviewed by the Inland Wetlands Commission. Since no inland wetlands application was made, Attorney Fallon suggested that the Commission could not grant the subdivision approval.
Attorney Fallon also filed a memorandum from the Department of Environmental Protection which indicated that "[t]he site is at the head of waters of a public water supply watershed." However, he was unable to support this assertion with a map depicting the Cioffoletti property as a watershed area. The purpose of this watershed submission was to prove that Cioffoletti had not complied with § 8-3i, which requires an applicant who proposes to develop lands within a watershed to notify the water company of his plans prior to proceeding to CT Page 256 subdivision approval. Attorney Fallon also argued that the particulars of the subdivision application process contained in § 6-6(f), (g) (h) of the Ridgefield Code were not followed since the submissions by Cioffoletti did not include a title certificate, a cost estimate and a submission from the health officer dealing with water quality. Lastly, Attorney Fallon argued that the Commission's acceptance of new documents subsequent to the adjourned portion of the hearing was improper and a violation of due process.
In connection with his presentation, Attorney Fallon submitted pictures detailing the operation and condition of the property, including a huge manure pile, machinery in operation, logs and piles of cement and asphalt. A professional engineer, one Fanotto, retained by Gelfman, filed a report with the Commission. During his testimony, he opined that the eleven year old soil data submitted by Cioffoletti in support of his application was too dated to be useful, especially since the area has been used for mining purposes. His concern was mostly with lot 8 since it bordered on wetlands. He also testified that the storm water discharge into a siltation basin could potentially spill into the pond, causing wetlands contamination. Fanotto suggested that the construction of a sediment basin would be appropriate, and concluded by indicating that in his opinion an inland wetlands application was required on this site as a result of the potential storm water drainage into the pond and the fact that construction would occur near the wetlands.
In response to the position taken by Fanotto, the Commission queried One Inglese, the Ridgefield inland wetlands agent, with respect to whether there was any activity within a regulated area, thereby conferring inland wetlands jurisdiction. Inglese reviewed the plans submitted by Cioffoletti and stated that, "I don't see any deposition being made within the wetlands . . . . I don't see any wetland activity taking place within that, based upon the delineation of the wetland that I see this evening."
 Mr. Katz: So it is your testimony this evening that there is no regulated activity that is going to be performed west, pardon me, east of the line that we have agreed is, in fact, the wetland boundary at that site?
Mr. Wood: That's correct. CT Page 257
 Mr. Katz: Is that your observation as well, Ozzie?
Mr. Inglese: As far as I can see, yes, as far as I can see.
Fanotto's report acknowledges as much in stating that "no activity is proposed within the wetlands." The storm water runoff, however, constituted a different problem. Inglese was not able to express an opinion as to whether that discharge amounted to regulated activity within the meaning of the Inland Wetlands Regulations. His preliminary opinion was that it did not engage wetlands jurisdiction. Nevertheless, he felt it appropriate to consult with the Department of Environmental Protection to confirm his opinion. His only concern with wetlands jurisdiction was whether the storm water discharge into the pond was a regulated activity.
Inglese spoke to Attorney Fallon's objections based on § 6-6 of the Ridgefield Code concerning Cioffoletti's failure to include a proposed cost of construction, a title abstract and a certification concerning the propriety of water provision on the property. He testified that the cost and water provision submissions are never received with a subdivision application because, practically, they are unknowns at the time the subdivision application is filed. The title abstract, however, is normally received.
The Commission questioned Fanotto with respect to his claim that the soil testing was inadequate. One Katz, (mentioned supra) a Commission member, asked Fanotto whether there was a regulation in the Ridgefield Code that required specific testing of the site to be used for the septic system. Fanotto's response was that the regulations required the sanitarian to address the suitability of the site, however there was no regulation demanding specific soil testing of the site. Fanotto later conceded that the regulation requiring a 50 foot setback from the wetlands was satisfied by Cioffoletti's submittals.
Attorney Fallon, in drawing upon Fanotto's testimony concerning the wetlands permit requirement, the photos submitted, and the history of the use of the land, urged the Commission to find that by approving the applications it would be shirking its charge under the General Statutes and subdivision regulations to promote the general welfare since the land was not "of such a CT Page 258 character that it can be used for building purposes without danger to health or public safety." In support of this position, Fanotto's report indicates that a danger is present due to the extensive soil disturbances on the property.
To rebut Fanotto's position that the materials submitted by Cioffoletti with respect to the soil tests were dated, Cioffoletti's engineer, Wood, testified that he had rebored eleven holes in 1994 to test the soils, with the advice and consent of the town sanitarian. No reboring was performed on lot 8, however, since that area was mostly undisturbed. The town sanitarian toured the Cioffoletti property on an ongoing basis making inspections to ensure compliance with appropriate ordinances. All of this information was available to the sanitarian when he wrote the letter of approval in support of Cioffoletti's applications.
Wood also testified that buried construction debris, including concrete, would be removed from the house sites in order to pour the foundations. As a result, he opined that the houses would be safe and there would be no sink holes. Cioffoletti testified that "without a doubt" there would be no sinkage and that the properties would be stable and sound for the future homeowners. It was also noted that the building inspector would oversee the construction of the houses and roads in the future to ensure compliance with all safety requirements.
After testimony was completed, the Commission determined that a continuance was in order based on the need to obtain additional information concerning the need for an inland wetlands application. Consequently, the hearing was continued to December 13, 1994. In the interim, on November 28, 1994, the zoning enforcement officer entered the property for purposes of an inspection and determined that all firewood had been removed from the site and that the mechanical stone processor had been removed as well. Based on the concerns raised at the November 11, 1994 hearing, Cioffoletti filed a wetlands application, even after Inglese had indicated that it was unnecessary.
On December 13, 1994, the hearing reconvened and Wood testified, in response to the concerns of the Gelfmans, that the siltation basin was pulled back further from the wetlands. The plans were modified to protect the pond to prevent any construction activity, once the subdivision is under construction, from interfering with any of the pond perimeter at CT Page 259 all once it is stabilized.
Inglese also testified concerning his review of the wetlands implications for the development. He read a memorandum he prepared, after conferring with a DEP official, that recites that "[d]uring the public hearing regarding the above subdivision, questions were raised regarding a wetland application in connection with surface runoff discharge onto a wetland. I discussed with DEP the need for having such application. I was informed that DEP practice is to require the submission of an application when the applicant has failed to make sufficient provisions to control runoff velocity and/or to retain siltation at the point of discharge. Sufficient provisions means the installation of energy dissipators, siltation traps and similar devices. This is the DEP's practice and has been Ridgefield's. In the Cioffoletti case, the applicant submitted plans that include energy dissipators and siltation traps. These devices were shown on the original plans as well as the revised plans submitted at the public hearing. The Commission/Board has approved plans similar to those in the Cioffoletti application that included energy dissipators and siltation traps. In light of the designs submitted by Cioffoletti, I saw no reason, and I still do not see any reason, to deviate from standard practice and to request the submission of a wetland application."
Attorney Fallon again presented the Gelfmans' case. He reargued that a wetlands application was required and further that it was improper and a violation of due process for the Commission to allow Cioffoletti to amend his application by submitting new and different maps before each hearing. At every hearing, he was accompanied by his client, Mary Hughes Boyce Gelfman. He also filed a supplemental memorandum in support of his client's position. The Gelfmans submitted additional photos of the area. Attorney Fallon advanced an additional argument that since Cioffoletti's PRD application requested the approval of eight lots, rather than seven, it was in violation of the Commission's own regulations. Attorney Fallon argued, in support of this position, that § 308.0G(1) of the Ridgefield Code mandated that a PRD cannot have more lots than a conventional subdivision, and that a conventional subdivision under the circumstances of this case would only allow for seven lots.
Wood's testimony at the December 13, 1994 hearing noted that he had dug additional soil testing holes on the property since the last meeting in response to the concerns raised by Attorney CT Page 260 Fallon that insufficient testing had been conducted. Those tests showed no change from the soil tests conducted eleven years ago. He continued that "[w]e responded to everything they have asked us to do. And again, want to emphasize that this is beyond what we normally do. The Health Department reviews the thing; it is their judgment that these lots are suitable for on-site sewage disposal; we submitted a report that is required by the regulations for professional engineering that says they are suitable, and that is standard with the regulations. And I would like to state that Mr. Fallon is familiar with a subdivision we did in Fairfield, and their subdivision, they had test holes on every third lot, so it is not a question of where they are or how many. It is a judgment as to how many you need to justify that you can put on-site sewage disposal systems on these lots." In connection with the test pit sites, he filed maps that indicated the location of the holes. He filed a written report of the test holes dug on October 6, 1994 and, thereafter, the hearing was completed.
On December 14, 1994, Cioffoletti's attorney withdrew the wetlands application, writing, "[t]he only reason it was filed was to `cover the bases' which had been discussed by the opposition. Clearly, based upon the inland wetlands agent's testimony, no wetlands application was necessary and it is hereby withdrawn."
On December 20, 1994, the Commission and the Inland Wetlands Commission announced a special meeting to decide Cioffoletti's applications. On the same date, the Inland Wetlands Commission voted to accept the withdrawal of Cioffoletti's inland wetlands application essentially agreeing that an inland wetlands application was unnecessary.
Thereafter, sitting as the Commission, it granted PRD designation to Cioffoletti. It then debated whether subdivision approval was appropriate, concentrating on whether the eight lot subdivision comported with the regulations or whether the stipulation, allowing for an eight lot subdivision, was in violation of the PRD regulations. It tabled the discussion until the next meeting. The notice of decision on the PRD application was published in The Ridgefield Press on December 29, 1994.
On January 10, 1995, the final meeting to discuss PRD subdivision approval occurred. The Commission granted approval of the PRD subdivision, with modifications, and incorporated the CT Page 261 "Adopted Resolution" into the record. The approval contained such conditions that the PRD subdivision be subject to site plan review; that the water be tested prior to issuance of zoning permits, by a qualified laboratory to ascertain its purity; that the soil tests on lots 2-6 be conducted again "to ascertain suitability for septic systems"; that a regrade plan be instituted to "avoid long term erosion difficulties"; that an inspection entitlement be reserved to the Commission; that the Conservation Commission be allowed to construct pedestrian paths through the open space; that erosion and sedimentation plans be filed prior to obtaining zoning approval; that a 10,000 underground cistern be built for firefighting purposes; that the homesites be oriented to obtain maximum beneficial solar heat; and, inter alia, that Cioffoletti post appropriate bonds.
In acting on the above PRD Subdivision, the Planning Zoning Commission recited that it wished to state upon its records that said action was taken (1) in recognition of the application's compliance with the Subdivision Regulations; (2) because in the Commission's judgment, the proposed development, together with the foregoing conditions of approval, would not exert a detrimental effect on the orderly development of the district; and (3) because the action will greatly contribute in reestablishing the residential character of the neighborhood which character was severely compromised by the uses conducted at the site. In addition, the records of the Commission show that the application complied with the terms and conditions of the Stipulation for Judgment entered by and between the applicant and the Commission and approved by the Danbury Superior Court on July 29, 1994. Furthermore, the records of the Commission show that it granted PRD designation for the 24.5-acre site under Sec. 308 of the Zoning Regulations effective December 30, 1994. On January 19, 1995, the notice of decision was published in TheRidgefield Press.
The Gelfman brief offered the following arguments: (1) the Commission violated § 8-26 of the General Statutes by failing to require Cioffoletti to file an inland wetlands application simultaneously with his PRD and subdivision applications; (2) the Commission violated §§ 1-3, 6-6(g), 308.0C 308.0F of the Ridgefield Code and § 8-25 of the General Statutes by failing to require Cioffoletti to file a complete report of the sanitarian, by failing to require a complete soil report, by failing to obtain a written approval of the director of health with respect to the water supply and, in general, that the CT Page 262 application failed to show there was no danger to public health or safety; (3) the Commission violated §§ 6-6(f) (h) of the Ridgefield Code by failing to require Cioffoletti to file a title certificate and the estimated cost of construction; (4) the Commission erred in allowing Cioffoletti to amend his application periodically throughout the hearing process in violation of the Gelfmans' due process rights; and, (5) the Commission's rendering of PRD approval violated the PRD regulations, § 308.0G of the Ridgefield Code, since the number of lots approved exceeds the number of lots the Commission could approve under the regulations.
Cioffoletti's brief argued that the Commission did not violate § 8-26 of the General Statutes since the Commission determined, as did the Inland Wetlands Commission, in its discretion, that an inland wetlands application was not necessary for the site as there was no regulated activity. He continued by asserting that the statutory language referring to the submission of a report by the various town agencies prior to ruling on the subdivision application is a discretionary matter rather than a mandatory requirement. In short, shall does not mean shall. He claimed that under the PRD regulations, mathematical calculations reveal that an eight lot subdivision is indeed appropriate. In response to the Gelfmans' claims, that the report from the sanitarian is insufficient, he argued that the required submissions were made. He claimed that the soil testing samples submitted were sufficient to satisfy the regulations. He responded to the Gelfmans' argument that the Commission's failure to require Cioffoletti to include a title abstract and certify the cost of construction of the project are grounds for sustaining by asserting that the requirements are merely directory and that the Commission can require the presentation of the necessary materials through the use of conditions attached to the approval. Finally, to rebut Gelfmans' argument that they received inadequate notice of the nature of the proceedings before the Commission, he claimed that the precise actions need not be noticed, rather the law requires only that the notice fairly and sufficiently apprise interested persons of the character and nature of the action proposed in order to make possible intelligent preparation for participation in the hearing. The Commission has basically adopted the arguments set forth in Cioffoletti's submission.
The Gelfmans allege that they are aggrieved by the actions of the Commission, and that their property abuts the property that CT Page 263 was the subject of the Commission's actions. Abutting property owners are statutorily aggrieved and have standing to contest the Commission's decision under § 8-8(1) of the General Statutes. Accordingly, the court finds that the Gelfmans are aggrieved parties.
In order to take advantage of a statutory right to appeal from a decision of an administrative agency, there must be strict compliance with the statutory provisions which created the right.Simko v. Zoning Board of Appeals, 206 Conn. 374, 377. Where an appeal is filed after the statutory appeal period has expired, the trial court lacks subject matter jurisdiction over the appeal and must dismiss the case. Upjohn Co. v. Zoning Board of Appeals,224 Conn. 96, 102. Compliance with statutory notice provisions is a prerequisite to a valid administrative action and the failure to publish notice as required by statute is a jurisdictional defect rendering the Commission's decision void. Wright v. ZoningBoard of Appeals, 174 Conn. 488, 491.
The Gelfmans' appeals from the Commission to this court are controlled by § 8-8. Section 8-8(b) provides that any person aggrieved by any decision of a board may take an appeal to the Superior Court for the Judicial District in which the municipality is located. The appeal shall be commenced by service of process within fifteen days from the date that notice of the decision was published as required by the General Statutes. The appeal shall be returned to court in the same manner and within the same period of time as prescribed for civil actions brought to that court.
They commenced the PRD appeal by service of process on January 13, 1995, fifteen days after the Commission's decision was published in The Ridgefield Press on December 29, 1994. The subdivision appeal began by service of process on January 30, 1995, eleven days after the Commission's decision was published in the same medium on January 19, 1995. The appeals are timely under the statute.
The burden of proof to demonstrate that the Commission acted improperly is upon the Gelfmans. Gorman Construction Co. v.Planning Zoning Commission, 35 Conn. App. 191, 195. In exercising its function in approving or disapproving a subdivision plan or PRD designation, a planning commission acts in an administrative capacity. Westport v. Norwalk,167 Conn. 151, 155; RK Development Corp. v. Norwalk, 156 Conn. 369, 375; CT Page 264Forest Construction Co. v. Planning Zoning Commission,155 Conn. 669, 674. In passing on a subdivision (or PRD) application, a commission is controlled by the regulations that it has previously adopted. Westport v. Norwalk, supra; North RollingwoodProperty Owners Assn. v. City Plan Commission, 152 Conn. 518,521; Langbein v. Planning Board, 145 Conn. 674, 679; Beach v.Planning Zoning Commission, 141 Conn. 79, 83. Lombardo v.Planning Zoning Commission, 43 Conn. Sup. 508, 513-14, aff'd and opinion adopted, 38 Conn. App. 812, 815. If the application complies with the applicable regulations, the Commission must approve the plan or PRD application. RK Development Corp. v.Norwalk, supra, 375-76; Weatherly v. Town Planning ZoningCommission, 23 Conn. App. 115, 119.
In reviewing the Commission's actions, the court must determine whether the record reasonably supports the conclusions it reached. Property Group, Inc. v. Planning Zoning Commission,226 Conn. 684, 697. Where the Commission has stated the reasons for its decision, the court is not at liberty to probe beyond them. DeMaria v. Planning Zoning Commission, 159 Conn. 534,541; Central Bank for Savings v. Planning Zoning Commission,13 Conn. App. 448, 457. Where, however, the Commission fails to articulate the reasons for its decision, the court must comb the record to find those reasons. Shailer v. Planning ZoningCommission, 26 Conn. App. 17, 30. In applying the law to the facts of a particular case, the Commission is endowed with liberal discretion, and its decision will not be disturbed unless it is found to be unreasonable, arbitrary, or illegal. GormanConstruction Co. v. Planning Zoning Commission, supra, 195. Further, the court may not substitute its judgment for that of the zoning commission and must not disturb decisions of local commissions as long as a honest judgment has been reasonably and fairly exercised. Whittaker v. Zoning Board of Appeals,179 Conn. 650, 654; Molic v. Zoning Board of Appeals, 18 Conn. App. 159,164. Gorman Construction Co. v. Planning Zoning Commission, supra.
The Commission's regulations, as local ordinances, are "subject to the interpretation of the commission itself" and this court "must determine whether the commission has correctly interpreted its regulations and applied them with reasonable discretion to the facts." Shailer v. Planning ZoningCommission, 26 Conn. App. 17, 22. The Gelfmans' argue that the Commission violated § 8-26 of the General Statutes by failing to require Cioffoletti to file an inland wetlands application CT Page 265 simultaneously with his PRD and subdivision applications. This argument is easily dispatched since the Commission, sitting as the both the Planning Zoning Commission and the Inland Wetlands Commission determined, based on the evidence submitted, that no regulated activities were being conducted on the tract.[1]
Section 8-26 provides, inter alia, that if an application involves land regulated as an inland wetland or watercourse under the provisions of Chapter 440, the applicant shall submit an application to the agency responsible for administration of the inland wetlands regulations no later than the day the application is filed for the subdivision or resubdivision. The inland wetland authority has no jurisdiction to consider an application that does not involve wetlands issues. Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 552.
Here, the Commission determined that no inland wetlands application was necessary based on the documentation presented that no activities would be undertaken within the wetlands area. It viewed the property and the filings and was satisfied that Cioffoletti's activities would not occur within the perimeter of the wetlands area. In reviewing issues of fact, this court cannot substitute its discretion for that of the Commission. Horvath v.Zoning Board of Appeals, 163 Conn. 609. Moreover, facts supporting the Commission's decision may include knowledge acquired by commission members through personal observation of the site, or through personal knowledge of the area involved in the application. Oakwood Development Corporation v. Zoning Boardof Appeals, 20 Conn. App. 458, 460, cert. denied,215 Conn. 808. In this case, the Commission members were well acquainted with the Cioffoletti property and sufficient documentation existed in the record to allow it to conclude that no regulated activities were being planned for the site. The inland wetlands agent testified, after review of the application and a conversation with the Department of Environmental Protection, that no application was required. The appellants have failed to satisfy the court that the Commission acted illegally in not requiring Cioffoletti to file an inland wetlands application in conjunction with his subdivision application.
The Gelfmans assert that the Commission violated §§ 1-3, 6-6(g), 308.0C 308.0F of the Ridgefield Code and § 8-25 of the General Statutes by failing to require Cioffoletti to file a complete report of the sanitarian, by failing to require a complete soil report, by failing to obtain a written approval of CT Page 266 the director of health with respect to the water supply and, in general, that the application failed to show there was no danger to public health or safety.
They allege that the sanitarian's report was insufficient to comply with the requirements of § 8-25 of the General Statutes relative to the passage that the regulations shall provide that the land to be subdivided shall be of such character that it can be used for building purposes without danger to health or the public safety, and that proper provision shall be made for water, drainage and sewerage. Pursuant to that mandate, § 308.0F of the subject code provides that suitability of a tract with respect to sanitary facilities shall be determined by the town sanitarian's report. Section 6-6(g) requires written approval from the director of health, or his agent, certifying that the tests and methods of supplying water have been made in accordance with certain procedures.
The town sanitarian approved the Cioffoletti project after initial review and forwarded a letter to the Commission reflecting his approval. The weight to be attached to the sanitarian's approval is a matter of discretion for the Commission. See Arway v. Bloom, 29 Conn. App. 469, 480, appeal dismissed, 227 Conn. 797, 802. The fact that the sanitarian did not recite at length his findings is hardly fatal. See Rorabackv. Planning Zoning Commission, 32 Conn. App. 409, 415-16, cert. denied, 227 Conn. 927 (court held recitation of "this design is approved" to be sufficient).
Actual septic system design and installation of the septic system on each lot under supervision of the town sanitarian does not occur at the approval phase, but only when building permits are applied for after the subdivision is approved. The Commission conditioned approval of the subdivision upon a future showing that water tests were conducted by a qualified laboratory to ascertain its purity and that the soil tests on lots 2-6 be conducted again to ensure suitability for septic systems. Appending conditions to a subdivision approval to carry out health, safety and public welfare concerns set forth in §8-25 of the General Statutes is appropriate. In granting conditional subdivision approval, the commission is presumed to have acted in accordance with the law. Shailer v. Planning Zoning Commission, supra, 28-29.
The court finds that the sanitarian's opinion was sufficient CT Page 267 to comply with § 8-25 and §§ 6-6(g) and 308.0F.[2]
The next salvo fired against the administrative actions recites that the appeal should be sustained since the Commission violated § 6-6(f) (h) of the Ridgefield Code by failing to require Cioffoletti to file a title certificate and the estimated cost of construction in connection with the subdivision application, because § 6-6 is prefaced by the word "shall." The Commission and Cioffoletti, on the other hand, claim that these materials are not mandatory submissions but, rather, are directory in nature since the material requested is not vital.
It is, of course, difficult to lay down a general rule to determine in all cases when the provisions of a statute are merely directory, and when mandatory or imperative but, of all the rules mentioned, the test most satisfactory and conclusive is whether the prescribed mode of action is of the essence of the thing to be accomplished or, in other words, whether it relates to matter material or immaterial to matters of convenience or of substance. Gallup v. Smith, 59 Conn. 354, 358. Zoning Board ofAppeals v. Freedom of Information Commission, 198 Conn. 498, 503-04.
When considered in this content, the title certificate and the estimated costs of construction are merely incidental items that the Commission may wish to consider in evaluating a subdivision application. They clearly are not dispositive of whether a subdivision application should or should not be granted. The court finds that §§ 6-6(f) (h) are simply directory in nature, and the Commission's failure to obtain the title certificate and the estimated costs of construction does not entitle the appellants to prevail.
The appellants next assert that the appeal should be resolved in their favor since the Commission erred in allowing Cioffoletti to amend his application periodically throughout the hearing process, thereby violating their due process rights. They, however, have not invited the court's attention to any case supporting either directly or inferentially the "error" of the Commission's allowance or supplementation of an application during the hearing process.
"The purpose of the statutory public prehearing notice is fairly and sufficiently to apprise the public of the proposed action, so as to enable intelligent preparation for participation in the hearing. Cocivi v. Plan Zoning Commission, CT Page 26820 Conn. App. 705, 708. Although the notice may not be misleading, it need not be exact, and a public filing of the plan is relevant to the determination of the adequacy of the notice. R.B. Kent Son,Inc. v. Planning Commission, 21 Conn. App. 370, 378. The key is to notify the public of "the nature and character of the proposed action." Passero v. Zoning Commission, 155 Conn. 511, 514.
They do not argue that the published notice was insufficient. Rather, they claim that the substitution of maps was a reversible error. This, is not a correct interpretation of the law. The prehearing notice comported to the constitutional minimum of supplying interested persons of the nature and character of the proposed action. Cioffoletti wished to obtain PRD designation and subdivision approval of the piece of property he had formerly used as a gravel pit. The proposed subdivision map was filed in support of the application. The constitutional requirements of due process demand nothing more and this hypothesis avails them nothing.
The final assault on the Commission's actions is that the Commission acted illegally in rendering PRD designation pursuant to § 308.0G of the Ridgefield Code, since the number of lots approved exceed the number the Commission could grant under the regulations. Under § 308.0, a planned residential development can be appropriately approved, provided the prerequisites are met, even though the development would be in violation of the minimum lot size requirements of a particular zone. "The intent of this section is to provide meaningful areas of open space in residential developments by encouraging the clustering of single-family dwellings on lots smaller than those otherwise permittedin the underlying zone." (Emphasis added.) See § 308.0A of the code. To determine the maximum number of dwelling units allowed in a particular development, the net development area must be divided in accordance with § 308.0G:
 [B]y the minimum lot area per family required by the zoning district in which the tract is located. Net development area shall be determined by deducting ten (10) percent of the total acreage where new subdivision roads are proposed within the tract.
 If no new roads are proposed, the net development area shall be the same as the gross area of the tract. In calculating the net development area and the number of dwelling units, change fractions to the nearest whole CT Page 269 number, changing one-half (1/2) or greater to the next largest whole number. Notwithstanding the foregoing, the number of dwelling units shall in no case exceed the number which could be permitted, in the Commission's judgment, if the land were subdivided into lots conforming to the minimum lot size and density requirements of the Zoning Regulations applicable to the district or districts in which such land is situated.
The Cioffoletti property contains 24.5 acres. If 10 percent (2.45 acres) is deducted for the subdivision road, twenty-two acres remain. The minimum lot size in this particular zone is two acres. This results in eleven lots. Cioffoletti only asked for eight and eight is the number of lots the Commission approved. The plain language of the "notwithstanding clause" pointed to by the Gelfmans as support for their position; see North Haven v.Planning Zoning Commission, 220 Conn. 556, 562 (plain meaning of regulation controls); the maximum number of lots on the property would be twelve.
Where the PRD application complies with the applicable regulations, the Commission has no choice but to approve it. RKDevelopment Corp. v. Norwalk, supra. The regulations provide that Cioffoletti may receive approval for up to eleven lots. His request was for eight. Consequently, the Commission was required to grant PRD approval for the number requested. The arguments to the contrary are without merit. This claim, therefore, fails as well. The appeal is, accordingly, dismissed.
Moraghan, J.